**QWEST CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 00–43 C.**

United States Court of Federal Claims.

Feb. 20, 2001.

John H. Harwood II, Washington, D.C., attorney or record for plaintiff.

Lisa B. Donis, Washington, D.C., with whom was Assistant Attorney General David W. Ogden, for defendant.

## OPINION

LYDON, Senior Judge.

This is an action seeking just compensation under the Fifth Amendment to the United States Constitution for an alleged taking of property. Plaintiff asserts that under the Telecommunications Act of 1996, Public Law. No. 104–104, 110 Stat. 56, amending the Communications Act of 1934 and codified at 47 U.S.C. § 151, *et seq.*, as implemented by the Federal Communications Commission and applied by the Colorado Public Utilities Commission, it was required to provide certain of its property to its competitors, for an open-ended time period, at less than fair value. Defendant asserts that the court has no jurisdiction because the claim involves an alleged "confiscatory rate order" that cannot be challenged in this forum, or in the alternative, that plaintiff's property has not been taken by the United States. The action is before the court on plaintiff's motion for summary judgment and defendant's motion to dismiss, or in the alternative cross-motion for summary judgment. For the reasons discussed hereinafter, the court denies plaintiff's motion for summary judgment, denies defendant's motion to dismiss the complaint on jurisdictional grounds, and grant's defendant's cross-motion for summary judgment on the grounds that there has been no taking of the subject property.

The complaint was originally brought in the name of U S WEST Communications, Inc., a subsidiary of U S WEST, Inc. On June 30, 2000, however, U S WEST, Inc. merged with and into Qwest Communications International, Inc. The subsidiary U S WEST Communications, Inc. was renamed Qwest Corporation on July 6, 2000. Accordingly, the plaintiff in this action is now called Qwest Corporation. For convenience the court will hereinafter refer to plaintiff simply as "Qwest," even though most of the events pertinent to this action occurred prior to the name change.

## FACTS

Qwest Corporation ("Qwest") is a public service corporation incorporated under the laws of the State of Colorado and having its principal place of business in Denver. As defined in the Telecommunications Act of 1996 ("Telecom Act"), Qwest is a "Bell operating company," 47 U.S.C. § 153(4), and an "incumbent local exchange carrier" ("ILEC"), 47 U.S.C. § 251(h). It operates in 14 western and midwestern states—Arizona, Colorado, Idaho, Iowa, Minnesota, Montana, Nebraska, New Mexico, North Dakota, Oregon, South Dakota, Utah, Washington, and Wyoming—providing "telephone exchange service" to approximately 25 million residential and business customers.

Under the Telecom Act, 47 U.S.C. § 153(47), "telephone exchange service" is defined as "service within a telephone exchange, or within a connected system of telephone exchanges within the same exchange area operated to furnish to subscribers intercommunicating service of the character ordinarily furnished by a single exchange, and which is covered by the exchange service charge" or "comparable service provided through a system of switches, transmission equipment, or other facilities (or combination thereof) by which a subscriber can originate and terminate a telecommunications service." Qwest provides "exchange access" service to long distance carriers. The Telecom Act defines "exchange access" as "the offering of access to telephone exchange services or facilities for the purpose of the origination or

termination of telephone toll services." 47 U.S.C. § 153(16).

To provide telephone exchange service Qwest uses a network of cables and switches that connect the residences and businesses of its customers to each other and, through the networks of other carriers, to the customers of other carriers. In general, each Qwest customer is connected to Qwest's network by a twisted pair of copper wires, commonly referred to as a "loop," that runs from the customer's premises to a U S WEST switching office (often known as a "central office"). At the central office loops are connected to a switch and from there to the rest of Qwest's network. Qwest also provides customers, at their request, with optional enhancements to their telephone exchange service, such as (1) touch tone dialing, which allows a customer to place touch tone calls, (2) call hold, which places an incoming or outgoing call on hold, (3) call transfer, which enables a customer to transfer a call from one of the customer's lines to another, (4) call forwarding, which transfers a call placed to a customer's number to another number designated by the customer, and (5) hunting, which provides a roll-over feature for customers with more than one line, i.e., "hunting" for an available line. Qwest generally charges customers of telephone exchange service a flat monthly fee, referred to in 47 U.S.C. § 153(47) as the "exchange service charge," and charges separately for additional enhancements.

Qwest's provision of "exchange access services" to long distance carriers enables Qwest's customers to make long distance calls. When a Qwest customer makes a long distance call, the call travels over the customer's loop to a Qwest central office. Qwest carries the call over its network and delivers it to the long distance carrier selected by the customer. Qwest charges the long distance carrier "originating access charges" for this "exchange access service." The long distance carrier then carries the call to the local exchange serving the party. The local exchange carrier serving the called party (which could again be Qwest) carries the call from its central office over the loop of the called party to the called party's premises and charges the long distance carrier "termi-

nating access charges." In addition to these traffic-sensitive access charges, Qwest also imposes a monthly, flat per-line access charge on its customers. This charge, also known as the "end user line charge," is intended to recover some of the non-traffic-sensitive portion of the cost of providing exchange access service. All access charges are assessed pursuant to rules of the Federal Communications Commission (FCC) that regulate the amount that Qwest may charge for exchange access services.

### Telecommunications Act of 1996

ILECs historically provided local telecommunications services without being subject to competition, often pursuant to state-granted franchises. Prior to 1996 virtually all ILECs were Bell operating companies. The federal government as well as state governments pervasively regulated ILECs with respect to their services, facilities, revenues, expenses, rates, and profits. The Telecommunications Act of 1996, Public Law 104–104, 110 Stat. 56, 47 U.S.C. § 151, *et seq.*, enacted on February 8, 1996, opened the market for local telecommunications services to competition. As described in its purpose statement, the Telecom Act was designed "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." P.L. 104–104, 110 Stat. 56 at 56. The Act provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). It also requires the FCC to preempt the enforcement of any state or local statute, regulation, or other legal requirement that violates or is inconsistent with this provision. 47 U.S.C. § 253(d).

As a *quid pro quo* for opening up the ILECs' local markets to competition, the Telecom Act provided the opportunity for Bell operating companies (ILECs) to enter the long distance market, 47 U.S.C. § 271, as well as to manufacture telecommunications equipment, 47 U.S.C. § 273. Prior to 1996 the Bells were legally excluded from these markets. In order to obtain the requisite approval from the FCC to enter a long distance market and/or manufacture telecommunications equipment, an ILEC must first enter into an agreement with a competing local exchange carrier (CLEC) providing the latter with interconnection to the ILEC's network or access to its network elements. In other words, once an ILEC has opened its local market to competition, it may have access, *inter alia*, to the long distance market.

The Telecom Act requires ILECs to assist other telecommunications carriers in their efforts to enter the local service market and provide local service in direct competition with the incumbents. To that end the Act imposes certain affirmative obligations on ILECs, including "[t]he duty to provide . . . . [to] any requesting telecommunications carrier, interconnection with the ILEC's network," 47 U.S.C. § 251(c)(2), and "nondiscriminatory access to [the ILEC's] network elements on an unbundled basis." 47 U.S.C. § 251(c)(3). These services must be provided "at any technically feasible point" in the ILEC's network and "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory." *Id.* Furthermore, ILECs are obligated to allow the physical or virtual co-location (spelled "collocation" in the Act) of equipment necessary to effectuate the connections described above. As provided in 47 U.S.C. § 251(c)(6), ILECs have—

"[t]he duty to provide, on rates, terms and conditions that are just, reasonable, and nondiscriminatory, for physical collocation of equipment necessary for interconnection or access to unbundled network elements at the premises of the local exchange carrier, except that the carrier may provide for virtual collocation if the local exchange carrier demonstrates to the State commission that physical collocation is not practical for technical reasons or because of space limitations."

The FCC was directed, in 47 U.S.C. § 251(d)(1), to establish regulations to implement the foregoing provisions and, in 47 U.S.C. § 251(d)(2), to determine what unbundled network elements ["UNEs"] "should be

made available for purposes of subsection [251](c)(3)," the unbundling provision.

The Telecom Act also sets forth, in 47 U.S.C. § 252, the procedures for negotiation, arbitration, and approval of agreements between ILECs and CLECs. A "requesting carrier" begins the process by asking an ILEC to engage in "voluntary negotiations" to arrive at an interconnection agreement governing the terms and conditions of the ILEC's provision of UNEs to the CLEC, "includ[ing] a detailed schedule of itemized charges for interconnection and each service or network element included in the agreement." 47 U.S.C. § 252(a)(1). If the CLEC and the ILEC fail to reach agreement on all issues, either party may petition the appropriate state commission to arbitrate and decide any open issues. 47 U.S.C. § 252(b)(1). Both parties then are required to execute a final interconnection "agreement" incorporating the state commission's decision with respect to those issues. 47 U.S.C. § 252(b)(4)(C).

The state commission must ensure that an arbitrated agreement comports with the price regulations set forth by the FCC pursuant to 47 U.S.C. §§ 251(c)(1), 251(c)(3), and 251(d)(1), *supra.* As spelled out in 47 U.S.C. 252(d)(1)—"pricing standards for interconnection and network element charges"—

> Determinations by a State commission of the just and reasonable rate for the interconnection of facilities and equipment for purposes of subsection (c)(2) of section 251, and the just and reasonable rate for network elements for purposes of subsection (c)(3) of such section—(A) shall be—(i) based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element (whichever is applicable), and (ii) nondiscriminatory, and (B) may include a reasonable profit.

All interconnection agreements, whether negotiated or arbitrated, must be submitted to the state commission for approval. 47 U.S.C. § 252(e)(1). The state commission may only reject an agreement "voluntarily negotiated" (or mediated) under 47 U.S.C. § 252(a) if it finds that the agreement "discriminates against a telecommunications car-

rier not a party to the agreement" or "is not consistent with the public interest, convenience and necessity." 47 U.S.C. § 252(e)(2)(A). The state commission may only reject an agreement adopted by arbitration under 47 U.S.C. § 252(b) if it finds that the agreement "does not meet the requirements of section 251 of this title [which include the rates, terms, and conditions guidelines as stated in 47 U.S.C. § 251(c)(2) and (c)(3) ], including the regulations prescribed by the Commission pursuant to [47 U.S.C. § 251(d) ], or the [pricing] standards set forth in subsection [252](d)."

If a state commission fails to carry out its responsibility with respect to any proceeding or matter regarding the negotiation, arbitration, or approval of an interconnection agreement, the FCC may preempt the state commission's jurisdiction over the proceeding or matter at issue. 47 U.S.C. § 252(e)(5). Any party aggrieved by a state commission's decision may seek judicial review "in an appropriate Federal district court to determine whether the agreement .... meets the requirements of [sections 251 and 252]." 47 U.S.C. § 252(e)(6).

### *Implementation of the 1996 Act by the FCC*

On August 8, 1996, six months after enactment of the Telecommunications Act of 1996, the FCC issued its "Local Competition Order" with implementing rules. See *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, First Report and Order,* 11 FCC Rcd 15,499 (1996) ("*Local Competition Order*"); 47 C.F.R. § 51.307, *et seq.* Under the *Local Competition Order* Qwest is required to lease UNEs to requesting carriers. See 47 C.F.R. § 51.307. One of the UNEs that Qwest is required to make available is the local loop, which is defined as the "transmission facility between a distribution frame .... in an ILEC central office and the loop demarcation point at an end user customer premises .... The local loop network element includes all features, functions, and capabilities of such transmission facilities." 47 C.F.R. § 51.319(a)(1). A CLEC may use Qwest's local loops (possibly in conjunction

with other UNEs provided by Qwest) to provide telephone exchange service, enhancements, and exchange access service to customers. Qwest may not charge customers for services that CLECs provide using Qwest's loops. Qwest is also prohibited from collecting any access charge from the end user, the CLEC, or the long distance company that serves a given loop. See 47 C.F.R. § 51.515(a).

The FCC interpreted the Telecom Act as giving CLECs the right to "purchase exclusive access" to Qwest's loops. *Local Competition Order,* para. 258, 268. The FCC also construed the Act as enabling a CLEC to use a loop for whatever time period it chooses. *Id.* Qwest is prohibited from using a leased UNE loop to provide its own services, but must operate and maintain the leased loop on behalf of, and for the benefit of, the CLEC. *Id.* The FCC recently reaffirmed Qwest's continuing obligation to provide its competitors with unbundled loops on request. See *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996: Third Report and Order,* FCC 99–238, 1999 WL 1008985, para. 165–201 ("UNE Remand Order").

When a CLEC orders a UNE loop, Qwest provides that loop to the CLEC using a "lift and lay" procedure. In this procedure a Qwest central office technician "lifts" the loops from its current connection to Qwest's switch and "lays" it (via a "cross-over connection") on the CLEC's equipment that, under the Telecom Act, the CLEC is allowed to collocate on Qwest's premises. See 47 U.S.C. § 251(c)(6), *supra.* After the "lift and lay" procedure is completed the UNE loop is no longer connected to Qwest's switch, is no longer directly connected to Qwest's network, and cannot be used by Qwest as a pathway to provide service to the customer served thereby. The CLEC has full and exclusive use of the loop to provide service to the customer.

The FCC's rules generally direct state commissions to establish UNE prices "pursuant to the forward-looking economic cost-based pricing methodology" set forth in the rules (or pursuant to an FCC-established proxy). 47 C.F.R. § 51.503(b). Specifically,

the rules direct state commissions to calculate the forward-looking economic cost-based price of a UNE to be the sum of "the total element long-run incremental cost of the element" and "a reasonable allocation of forward-looking common costs." 47 C.F.R. § 51.505(a). FFC rules define these two parts of the sum as follows:

a. "The total element long-run incremental cost [or TELRIC] of an element is the forward-looking cost over the long run of the total quantity of the facilities and functions that are directly attributable to, or reasonably identifiable as incremental to, such element, calculated taking as a given the incumbent LEC's provision of other elements." 47 C.F.R. § 51.505(b). "The total element long-run incremental cost [TELRIC] of an element should be measured based on the use of the most efficient telecommunications technology currently available and the lowest cost network configuration, given the existing location of the incumbent LEC's wire centers." 47 C.F.R. § 51.505(b)(1).

b. "Forward-looking common costs are economic costs efficiently incurred in providing a group of elements or services (which may include all elements or services provided by the ILEC) that cannot be attributed directly to individual elements or services." 47 C.F.R. § 51.505(c)(1).

The pricing rules adopted by the FCC do not permit ILECs to recover certain costs included in the retail prices they charge for the local telecommunications services they provide. ILECs are prohibited from being compensated for the "opportunity costs" associated with the fact that they have been deprived of the right to use their loops to serve customers. 47 C.F.R. § 51.505(d)(3); *Local Competition Order,* para. 708–711. FCC rules define "opportunity costs" to "include the revenues that the ILEC would have received for the sale of telecommunications services, in the absence of competition from telecommunications carriers that purchase elements." 47 C.F.R. § 51.505(d)(3). ILECs are prohibited from being compensat-

ed for the historic or embedded costs of the unbundled loops that an ILEC must provide to a requesting carrier. See 47 C.F.R. § 51.505(d)(1); *Local Competition Order,* para. 704–707. FCC rules define "embedded costs" to be "the costs that the ILEC incurred in the past and that are recorded in the ILEC's books of accounts." 47 C.F.R. § 51.505(d)(1). ILECs are prohibited from being compensated for lost revenues that are used to fund their universal service obligations. See 47 C.F.R. § 51.505(d)(4); *Local Competition Order,* para. 712–715.

Qwest and other ILECs contested the FCC's pricing rules as violating the Telecom Act and not providing them with sufficient compensation for the lease of their UNEs. The pricing rules, as well as other regulations contained in the FCC's *Local Competition Order,* have been the subject of considerable litigation. In *Iowa Utilities Board, et al. v. FCC,* 120 F.3d 753, 800, 818 (8th Cir. 1997), which consolidated all of the lawsuits concerning the *Local Competition Order,*[1] the Eighth Circuit vacated much of the Order on the grounds that the FCC exceeded its jurisdiction in promulgating the TELRIC pricing rules. The court also held that takings claims based on the FCC's unbundling rules were not ripe for adjudication because the ILECs had not participated in state arbitration proceedings, as provided in the Telecom Act, to determine their compensation from the CLECs. Thus, the ILECs could not claim they were denied just compensation, and had no legal basis under the Act to seek judicial review in federal district court. The Supreme Court reversed the Eighth Circuit's opinion, in part, holding that the FCC does have jurisdiction to promulgate pricing rules and reinstating most of the FCC's rules, including the ones at issue in the case at bar. *AT & T Corp. v. FCC,* 525 U.S. 366, 385, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). On remand the Eighth Circuit upheld certain aspects of the FCC's pricing rules, vacated other aspects, and held that takings claims

based on the TELRIC pricing method were not ripe for adjudication because they did not involve rates that have been finally determined and applied. *Iowa Utilities Board, et al. v. FCC,* 219 F.3d 744, 751, 752, 754 (8th Cir.2000), *cert. granted,* —— U.S. ——, 121 S.Ct. 878, 148 L.Ed.2d 788 (2001).

### *Application of the 1996 Act and the FCC Rules by the Colorado Commission*

On February 8, 1996, TCG Colorado ("TCG"), a telecommunications carrier operating in Colorado, requested that Qwest enter into interconnection negotiations pursuant to sections 251 and 252 of the Telecom Act. TCG subsequently requested arbitration by the Colorado Public Utilities Commission ("Colorado Commission"). On January 15, 1997, the Colorado Commission imposed an interconnection "agreement" on the two carriers ("Qwest/TCG Agreement"). See *Colorado Pub. Utils. Comm'n, TCG Colorado Petition for Arbitration, Decision Granting Application for Approval of Interconnection Agreement,* Decision No. C97–50, Docket No. 96A–331T (Jan. 15, 1997) ("January 15 Order"). The Qwest/TCG Agreement requires Qwest, among other things, to provide unbundled loops to TCG. The January 15 Order required the Qwest/TCG Agreement to incorporate by reference the final UNE loop prices to be determined subsequently by the Colorado Commission in Docket No. 96A–331T.

On July 16, 1997, the Colorado Commission adopted a final order setting the prices for UNEs, including loops, in Colorado. See *Colorado Pub. Utils. Comm'n, Investigation and Suspension of Tariff Sheet Filed by U S WEST Communications, Inc. with Advice Letter No. 2617,* Docket No. 96A–331T (1997) ("*Colorado Pricing Order*"). In this order the Colorado Commission set final rates which permit Qwest to charge TCG $17.00 per month for a two-wire UNE loop and

---

1. The Federal Courts of Appeals have exclusive jurisdiction over challenges to FCC regulations. See 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a). When agency regulations are challenged in more than one court of appeals, the panel on multidistrict litigation, pursuant to 28 U.S.C. § 2112, consolidates the petitions and assigns them to a single circuit. The challenges to the FCC regulations implementing the Telecommunications Act of 1996 were consolidated in the Eighth Circuit. See *MCI Telecommunications Corp. v. U.S. West Communications,* 204 F.3d 1262, 1267 (9th Cir. 2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 504, 148 L.Ed.2d 473 (2000).

$2.65 per month for central office multiplexing,[2] for a monthly total of $19.65 per loop. These prices were based on the standard set forth in the Telecom Act, 47 U.S.C. § 252, and were consistent with the pricing methodology adopted by the FCC. See *Colorado Pricing Order* at 36–37. The Colorado Commission also determined that when Qwest does not provide retail services to end user customers it avoids costs equal to 15.7% of the retail price of business voice line service and 31.6% of the retail price for vertical features. *Id.* at 83–88.

Prior to October 27, 1999, Qwest had used 14 of its loops to serve one of its customers in Lakewood, Colorado ("Lakewood customer"), providing basic phone service, fax line service, and various vertical features. During the 22 months preceding October 27, 1999 (*i.e.*, from the beginning of 1998), Qwest had provided the Lakewood customer with one primary business line, two fax lines, eleven additional voice lines, hunting on eight lines, a vertical services package named "MVP11" (comprising touchtone dialing, call hold, call transfer, and three-way calling) on eight lines, call forwarding on seven lines, and expanded call forwarding. See *Lee Declaration*, para. 6. At the rates Qwest has charged other customers in the same serving area since October 27, 1999, Qwest's charges for these services would have amounted to $594.62 per month, broken down as follows:

TABLE 1: MONTHLY CUSTOMER REVENUE

| Type of Line | Quantity | Charge for Access Lines | Charge for Vertical Features | Total |
|---|---|---|---|---|
| Business Voice Line | 12 | $415.20 | | $415.20 |
| Business Fax Line | 2 | $ 69.20 | | $ 69.20 |
| MPV11 | 8 | | $ 48.00 | $ 48.00 |
| Hunting | 8 | | $ 32.72 | $ 32.72 |
| Call Forwarding | 7 | | $ 24.50 | $ 24.50 |
| Expanded Call Forwarding | 1 | | $ 5.00 | $ 5.00 |
| TOTAL | | $484.40 | $110.22 | $594.62 |

See *Lee Declaration*, para. 6, 7, 9, Tab. 1 & Att. A.

On October 13, 1999, pursuant to the interconnection agreement approved by the Colorado Commission, TCG ordered Qwest to unbundle and provide it with the 14 two-wire local loops that Qwest had been using to provide local telephone service to its Lakewood customer. On October 27, 1999, Qwest delivered the 14 loops to TCG and ceased providing service to the Lakewood customer. Qwest used the "lift and lay" procedure, as previously described, to convert the customer's 14 loops over to TCG. On October 27, 1999, Qwest ceased charging the Lakewood customer for the 14 loops or for any of the vertical services that the customer had previously purchased for those lines. Since that date TCG has leased the 14 loops from Qwest and used them to provide local services to the Lakewood customer.

Qwest is authorized to charge TCG the monthly rate of $275.10 for the 14 leased UNE loops and associated multiplexing services ($19.65 per loop), as approved by the Colorado Commission. Based on the avoided cost percentages determined by the Colorado Commission, Qwest avoids monthly costs totaling $110.88—consisting of $76.05 for business line services (15.7% of $484.40) and $34.83 for vertical features (31.6% of $110.22)—because it no longer provides retail services to the Lakewood customer. The difference between the monthly revenue that Qwest currently receives from 14 equivalent loops used by other customers ($483.74—*i.e.*, $594.62 minus $110.88) and the monthly revenue it obtains for the leased loops from TCG ($275.10) is $208.64 per month.

On January 27, 2000, plaintiff commenced litigation in this court by filing a complaint

---

**2.** Multiplexing is a process of aggregating traffic from a number of different customers (and thus initially carried over a number of different loops)

for a more efficient transport through the network.

alleging that the Telecom Act, as implemented by the FCC and applied by the Colorado Commission, effects a taking of the 14 local loops without just compensation by obligating Qwest to provide them to a competitor for an indeterminate time at a price considerably below their value. Qwest claims that it is entitled to "just compensation" under the Fifth Amendment equal to $208.64 per month (*i.e.*, the "going concern" value of the loops—$484.40 per month—minus the rate it is allowed to charge by the Colorado Commission—$275.10 per month).[3] An amended complaint, with minor changes from the original, was filed on March 7, 2000. Defendant's answer was filed on April 25, 2000. Plaintiff filed its motion for summary judgment on May 19, 2000. Defendant responded, on June 29, 2000, with a motion to dismiss, or in the alternative cross-motion for summary judgment. Defendant's motion to dismiss challenges this court's jurisdiction over the complaint, while the alternative motion for summary judgment argues that there has been no taking of plaintiff's property. Oral argument was held on December 12, 2000. Supplemental briefing was completed on February 9, 2001.

## DISCUSSION

The Tucker Act, 28 U.S.C. § 1491(a)(1), vests the Court of Federal Claims with jurisdiction, *inter alia*, over "any claim against the United States founded upon the Constitution." To be cognizable in this court, "[t]he claim must, of course, be for money," *Eastport Steamship Corporation v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002, 1007 (1967), and it must invoke a provision of law conferring a substantive right to recover money damages from the United States. See *Ramirez v. United States*, 36 Fed.Cl. 467, 472 (1996). It is well established that the takings clause of the Fifth Amendment to the U.S. Constitution ("nor shall private property be taken for public use without just compensation") is a money-mandating provision on which a claim may be based in this court. See *United States v. Causby*, 328

U.S. 256, 258, 267, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). At the same time, the Tucker Act jurisdiction of the Court of Federal Claims is constrained by the power of Congress, which created the court under Article 1 of the Constitution, to withdraw that jurisdiction for particular types of claims. See *Blanchette v. Connecticut General Insurance Corp.*, 419 U.S. 102, 126, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1017, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).

In the case at bar, Qwest argues that its property, the 14 local loops, has been subject to a "physical taking" without just compensation, in violation of the Fifth Amendment. As such, its complaint is actionable in this court under the Tucker Act as a claim for money founded on the Constitution. Plaintiff makes no claim that its loops have been subject to a "regulatory taking"—*i.e.*, that the rate it is allowed to charge TCG for the use of its 14 loops under the Telecom Act, as implemented by the FCC and the Colorado Commission, is confiscatorily low. At oral argument counsel for plaintiff emphasized this point: "We're not challenging the price that is set by the Colorado Commission." (Transcript at 12.)

Defendant argues that plaintiff's complaint fails on two grounds: (1) this court lacks jurisdiction over the action and (2) there has been no physical taking of Qwest's property. With respect to jurisdiction, defendant asserts that plaintiff's action, notwithstanding the attempt to frame it as a physical taking claim, is actually a "confiscatory rate order" claim which, under the terms of the Telecommunications Act of 1996, falls outside the jurisdiction of this court. The Telecom Act provides that any party dissatisfied with a rate set by a state commission in an arbitration proceeding may seek judicial review "in an appropriate Federal district court." 47 U.S.C. § 252(e)(6). Since Qwest is really challenging the rates set by the Colorado Commission, according to the Government, it cannot seek judicial review in the Court of

---

**3.** Plaintiff has made no mention of any other former customers whose business it has lost to a competing provider pursuant to the Telecom Act. So it is unclear whether the Lakewood customer

is merely a test case for other potential claims involving the thousands of loops Qwest owns in its 14–state area of operation.

Federal Claims. In addition, defendant contends that the judicial review authority of federal district courts, under 47 U.S.C. § 252(e)(6), also embraces claims alleging a physical taking. Thus, in defendant's view a federal district court is the proper forum for judicial review of any and all claims arising under the Telecom Act. Furthermore, even if the Court of Federal Claims were to determine that it had jurisdiction over this action, defendant maintains that there has been no physical taking, or any other taking, of Qwest's property on which to base a claim for just compensation under the Fifth Amendment.

## *Jurisdiction*

### I.

Defendant's initial argument is that plaintiff's action is essentially a "confiscatory rate order" claim, for which the Telecom Act has invested judicial review exclusively in federal district courts. Confiscatory rate order cases are a species of "regulatory takings" cases arising in the public utility arena. Typically, a complainant argues that the rate set by the competent government authority is so low as to be confiscatory. A reviewing court has the authority to either enjoin confiscatory rates, remand the case back to the rate-making agency, or order new rates to be determined. See *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944); *Bluefield Water Works v. Public Service Commission*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923); *Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission*, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981 (1923). But reviewing courts cannot usurp the authority of rate-making agencies to determine rates, defendant contends, and cites two leading cases dealing with the jurisdictional constraints on this court's predecessor (the Court of Claims) to review rate decisions by federal agencies charged with regulating common carriers.

In *United States v. Jones*, 336 U.S. 641, 69 S.Ct. 787, 93 L.Ed. 938 (1949), the Supreme Court held that the Court of Claims did not have jurisdiction to consider a lawsuit based upon an allegedly invalid rate set by the Interstate Commerce Commission (ICC) for carrying mail on the railroads. Under a 1916 statute, the Railway Mail Pay Act, the ICC was vested with exclusive authority to set "fair and reasonable rates" for the rail transport of mail. Though federal law provided for limited judicial review (by district courts or the Court of Claims) of the ICC's rate orders—*i.e.*, as to whether they were statutorily invalid or confiscatory under the Constitution—the Supreme Court declared that "[n]o power was given the reviewing court to revise [rate orders] when found invalid, or to render judgment for any amount thought to be due under such a revision." 336 U.S. at 651, 69 S.Ct. 787. Focusing specifically on Court of Claims jurisdiction, the Supreme Court determined that "Congress in no instance has expressly empowered the Court of Claims to review rate orders of the Commission, either to set them aside or to render a money judgment or additional amounts found due upon a determination of an order's invalidity." *Id.* Moreover, the Supreme Court declared that "[t]he same result would follow if .... the suit could be regarded as one for just compensation under the Fifth Amendment [*i.e.*, if it alleged a confiscatory rate]." *Id.* at 669, 69 S.Ct. 787. If the Court of Claims did find that an ICC rate order was confiscatory in its effect, the Supreme Court indicated that "the Court of Claims could [not] foreclose the [ICC] from further consideration of the order and [the court could not] render final judgment for the amount by which it had found the order confiscatory. This not only would short-circuit the Commission in the rate-making process, but would involve substituting the court's judgment for the Commission's as to the amount of any new rate which might be fixed." *Id.* at 670–71, 69 S.Ct. 787.

In *Capital Airlines, Inc. v. United States*, 116 Ct.Cl. 850, 90 F.Supp. 926 (1950), *cert. denied*, 340 U.S. 875, 71 S.Ct. 121, 95 L.Ed. 636 (1950), plaintiff claimed that a rate set by the Civil Aeronautics Board (CAB) for mail delivery was confiscatory. The Court of Claims, citing the Supreme Court's ruling in *Jones*, concluded that it did not have jurisdiction to consider the airline's claim for just compensation because the CAB had the authority to set rates under the Civil Aeronautics Act. Pursuant to that Act, any appeal of

the CAB's rates had to be taken to a U.S. Court of Appeals, not to the Court of Claims. "It is clear that a carrier cannot obtain in this court a review or revision of a mail rate which has been fixed and paid pursuant to an order of the Civil Aeronautics Board," the Court of Claims held, "merely by basing its claim for a money judgment upon the just compensation provisions of the Fifth Amendment." *Id.* at 931. That is exactly what Qwest is trying to do in the case at bar, defendant argues, by casting its rate challenge as a physical taking under the Fifth Amendment.

As in the foregoing cases, defendant argues, the Court of Federal Claims is precluded by the judicial review provision of the Telecom Act from exercising jurisdiction over any claim by Qwest based on an allegedly confiscatory rate order by the Colorado Commission. Such claims can only be considered in a federal district court, as provided in 47 U.S.C. § 252(e)(6). Moreover, Qwest cannot circumvent this jurisdictional barrier by framing its claim as a physical taking because, in the Government's view, the Act vests federal district courts with jurisdiction over these types of claims as well. According to the Government, therefore, federal district courts are vested with jurisdiction of all claims emanating from state commission determinations under the Telecom Act, which trumps the general takings jurisdiction of the Court of Federal Claims under the Tucker Act.

## II.

The Government's argument has a couple of problems. The first is that it mischaracterizes plaintiff's claim. Despite defendant's efforts to redefine this action as a rate challenge, the salient fact is that Qwest is claiming that 14 of its local loops have been physically taken over by TCG via the government-compelled lease, and that Qwest has not received just compensation for that taking. Qwest's complaint alleges an unconstitutional physical taking of its property, actionable in this court under the Tucker Act, based on the forced transfer to TCG of the possession and use of, as well as the income generated by, the loops. A court must look to the way

a complaint is drawn in considering whether it meets jurisdictional muster. "[T]he party who brings a suit is master to decide what law he will rely upon ...." *Bell v. Hood,* 327 U.S. 678, 681, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Qwest does not base its complaint on any allegation that the rate it is allowed to charge TCG for the use of its 14 local loops is confiscatorily low. At oral argument counsel for plaintiff emphasized this point: "We're not challenging the price that is set by the Colorado Commission." (Transcript at 12). So Qwest's action cannot be characterized as a "confiscatory rate order" claim. The two cases cited and relied upon by the Government—*Jones* and *Capital Airlines, supra*—are inapposite because, in contrast to the case at bar, those claims *were* based on rate challenges and did *not* involve any allegations of a physical taking of the plaintiffs' property.

The second problem with defendant's argument is its reading of the judicial review provision of the Telecom Act as investing federal district courts with exclusive jurisdiction of all takings claims arising under the Act. The judicial review subsection provides, in pertinent part, as follows:

> "In any case in which a State commission makes a determination under this section [§ 252: the negotiation, arbitration, and approval of agreements], any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement .... meets the requirements of section 251 of this title [Interconnection] and this section."

47 U.S.C. § 252(e)(6). Thus, federal district courts are empowered to determine whether an arbitration agreement imposed on an ILEC and a CLEC by a state commission conforms with the requirements of sections 251 and 252 of the Act. As previously discussed, these sections require that ILECs provide requesting CLECs with interconnection to their networks and access to the ILEC's unbundled network elements "on rates, terms, and conditions that are just, reasonable and nondiscriminatory," 47 U.S.C. § 251(c)(2) and (c)(3), and allow for the "collocation" of a CLEC's equipment on

the ILEC's premises, 47 U.S.C. § 251(c)(6). They directed the FCC to issue implementing regulations, 47 U.S.C. § 251(d)(1). They authorized state commissions to arbitrate interconnection agreements for ILECs and CLECs unable to negotiate agreements on their own, and to impose agreements on the parties that comport with the requirements of § 251 and the FCC's implementing regulations for interconnection and access to UNEs, 47 U.S.C. § 252(b)(4)(C). Arbitrated agreements must also comport with the pricing standards set forth in 47 U.S.C. § 252(d)(1), which require that the "just and reasonable" rates determined by state commissions for interconnection and access to network elements be based on "the cost (determined without reference to a rate-of-return or other rate based proceeding) of providing the interconnection or network element" and allow for "a reasonable profit."

Plaintiff argues that its physical taking claim cannot be heard by a federal district court because, under 47 U.S.C. § 252(e)(6), judicial review of an arbitrated agreement imposed by a state commission is limited to consideration of whether the agreement meets the requirements of the Telecom Act, as set forth in sections 251 and 252 of the Act.[4] Qwest concedes that the Colorado Commission properly applied the requirements of sections 251 and 252, including the FCC's implementing regulations, in arbitrating the Qwest/TCG Agreement. Qwest contends that it sought and obtained in the arbitration proceeding all the compensation that was available under the Telecom Act for the lease of its 14 loops. But the compulsory lease amounted to a taking of the subject loops, Qwest asserts, and the amount of compensation it received was constitutionally inade-

quate. That claim of a taking without just compensation cannot be considered by a federal district court, plaintiff maintains, because it is not based on any action by the Colorado Commission that violated section 251 or 252 of the Telecom Act. Moreover, seeking the full measure of "just compensation" in a district court would be futile, according to plaintiff, because the pricing methodology of the Telecom Act does not afford such compensation. In other words, the Telecom Act does not provide an avenue for Qwest to seek just compensation for the taking of its loops. Since federal district courts are precluded from granting such relief under the Telecom Act, plaintiff argues that it must be allowed to bring its case in the Court of Federal Claims under the Tucker Act.

Defendant argues that the scope of the judicial review provision in the Telecom Act encompasses claims alleging physical takings. The language of Sections 251 and 252, which defines the subject matter of state commission determinations reviewable by federal district courts, lends some support to this position. State commissions must approve all interconnection agreements, whether voluntarily negotiated or arbitrated. 47 U.S.C. § 252(e)(1). Interconnection agreements cover not only rates, but the whole business relationship between ILECs and CLECs, including the terms and conditions of a CLEC's interconnection with the ILEC's network and its access to the ILEC's unbundled network elements. 47 U.S.C. § 251(c)(2) and (c)(3). In arbitration proceedings to resolve interconnection negotiations, state commissions are charged with ensuring that not only the rates, but also the terms and conditions of a CLEC's interconnection with the ILEC's network and its

---

4. Plaintiff cites recent case law as confirming this interpretation. See, e.g. *MCI Telecommunications Corp. v. U.S. West Communications*, 204 F.3d 1262, 1265 (9th Cir.2000) ("Review in federal court is limited to the determination of whether the agreement 'meets the requirements of' the Act. 47 U.S.C. § 252(e)(6)."), *cert. denied,* — U.S. —, 121 S.Ct. 504, 148 L.Ed.2d 473 (2000); *Illinois Bell Telephone Co. v. Worldcom Technologies, Inc.*, 179 F.3d 566, 572 (7th Cir.1999) (in examining a state commission determination, the court's task is "to see whether its decision violates federal law, as set out in the

Act or in the FCC's interpretation"), *cert. filed,* 69 USLW 3410 (Nov. 28, 2000); *MCI Telecommunications Corp. v. BellSouth Telecommunications, Inc.*, 112 F.Supp.2d 1286, 1290 (N.D.Fla.2000) ("[T]he statutory language makes no reference to any district court review of the state commission's action other than for compliance with the Act."); *Indiana Bell Telephone Co. v. McCarty*, 30 F.Supp.2d 1100, 1103 (S.D.Ind.1998) ("Jurisdiction exists under [§ 252(e)(6)] of the Act only if .... the claimant seeks review of whether .... an agreement .... satisfies the requirements of sections 251 and 252.").

access to the CLEC's network elements are just, reasonable, and nondiscriminatory. 47 U.S.C. § 252(c). Thus, the terms and conditions of a CLEC's access to an ILEC's network elements, including local loops, are among the items included in an interconnection agreement and thus eligible for arbitration by a state commission. An ILEC's claim that its local loops have been "physically taken" by a CLEC could fairly be interpreted as a complaint about the "terms and conditions" of the CLEC's access to the ILEC's loops, under the agreement determined or approved by the state commission. In the case at bar, therefore, Qwest's physical taking claim could be seen as emanating from a determination by the Colorado Commission, the judicial review of which is vested by 47 U.S.C. § 252(e)(6) in a federal district court.

This conclusion is supported by the case law in *Iowa Utilities Board et al. v. FCC, supra,* in which the Eighth Circuit interpreted many of the FCC's regulations implementing the Telecom Act. In its initial opinion, issued in 1997, the Eighth Circuit addressed the ILECs' argument that the FCC's unbundling rules "provide competing carriers with such extensive access and use of the incumbent LEC's networks that they effect unconstitutional takings of the incumbent LEC's property." 120 F.3d at 818. The court ruled that these physical takings claims were not yet ripe for review because the ILECs had not yet used the procedure provided under the Telecom Act—arbitration by the state commissions—to obtain compensation. Only after that avenue had been pursued, and arbitration agreements had been imposed which arguably denied just compensation, could ILECs seek a judicial remedy. The court specifically noted that "such a claim could be presented to a *federal district court* under the review provisions of subsection 252(e)(6)." *Id.* (emphasis added). Thus, the Eighth Circuit indicated that a claim for just compensation based on an alleged physical taking (like that advanced by Qwest in the case at bar) would be actionable in a federal district court.

In its subsequent opinion on remand from the Supreme Court, issued in 2000, the Eighth Circuit considered an alternative takings argument by the ILECs that the use of the TELRIC pricing method to set rates for interconnection and unbundling would mandate confiscatory rates. See *Iowa Utilities Board, et al. v. FCC,* 219 F.3d at 753. The court expressed the view that its own remand of the TELRIC rule to the FCC "should result in a new rule for determining the compensation that the ILECs will receive for the new competitor's use of the ILEC's property—a rule that should accurately determine the actual costs to the ILEC of furnishing its network (either by interconnection or on an unbundled element basis) to its competitors together with a permitted reasonable profit." *Id.* at 753–54. The court stated further that:

> "[i]n our earlier opinion we determined that the ILECs' claims that the FCC's unbundling rules constituted an unconstitutional taking were not ripe for adjudication..... [The Telecom Act provided] a mechanism (arbitration before the state commissions and *review in federal district court*) to determine what the *just and reasonable rates* would be in individual cases. That ripeness conclusion was *not attacked in the Supreme Court.* While we recognize that the argument made here (that TELRIC itself .... must result in rates that are neither just nor reasonable, and confiscatory in the constitutional sense) is not the same one we addressed in our earlier opinion, we conclude for many of the same reasons we expressed before, see *id.,* that the present takings claim is not ripe for review."

*Id.* at 754 (emphasis added). Thus, the Eighth Circuit restated its prior ruling that judicial review of an ILEC's claim based on a physical taking theory could be pursued in a federal district court. Since this would also be the case for a claim based on a confiscatory rate theory, the Eighth Circuit evidently views federal district court as a proper forum for all takings claims arising under the Telecom Act.

Similar views have been expressed by other federal courts in cases brought by the

instant plaintiff. In *U S West Communications v. MFS Intelenet, Inc., et al.,* 193 F.3d 1112 (9th Cir.1999), *cert. denied,* 530 U.S. 1284, 120 S.Ct. 2741, 147 L.Ed.2d 1005 (2000), Qwest challenged determinations by the Washington Utilities and Transportation Commission approving interconnection agreements, asserting among other things that the arbitration terms imposed by the Commission constituted a physical taking of its property. The Ninth Circuit upheld the lower court decision (of the U.S. District Court for the Western District of Washington) that the taking claim was unripe because plaintiff had not pursued its state law remedy, which provided compensation for takings. "Washington law does provide an independent remedy for takings," the court held, "and U.S. West must pursue that remedy before seeking relief under the Fifth Amendment." 193 F.3d at 1126. The Ninth Circuit raised no question as to the jurisdiction of the district court under the Telecom Act to hear and decide the taking claim, once it was ripe for review.

In *U S West Communications, Inc. v. Minnesota Public Utilities Commission, et al.,* 55 F.Supp.2d 968 (D.Minn.1999), the U.S. District Court for the District of Minnesota specifically found that it had jurisdiction of a taking claim by Qwest. That case involved a complaint by Qwest that an interconnection agreement approved by the state commission did not fully compensate plaintiff for its property and therefore constituted a taking. In rejecting defendant's argument that "[Qwest's] taking claim must fail because [*inter alia*] it exceeds the scope of this Court's jurisdiction, which is limited by 47 U.S.C. § 252(e)(6)," the district court stated as follows: "The Eighth Circuit explicitly noted that a takings claim can be presented to a federal district court under the review provisions of subsection 252(e)(6). *Iowa Utils. Bd.,* 120 F.3d at 818. Therefore, this Court has jurisdiction to hear the takings claim." 55 F.Supp.2d at 988. The taking claim was dismissed as unripe, however, since the district court found that Qwest had not yet exhausted its state law remedies—*i.e.,* petition to have its rates readjusted by the Minnesota Public Utilities Commission.

This court does not disagree with the foregoing circuit court and district court decisions, though it is not bound by their rulings. The language of the judicial review provision, 47 U.S.C. § 252(e)(6), and the rest of sections 251 and 252 to which it refers, does not clearly exclude federal district courts from considering takings claims arising from the arbitration determinations of state commissions under the Telecom Act. Federal courts do not seem to be united on the issue, however, as indicated by the various district court and circuit court rulings cited in note 4, *supra,* implying that district court review does not extend to takings claims. Indeed, the Ninth Circuit could be interpreted as taking contradictory stances on the issue in two cases involving the instant plaintiff—*U S West Communications v. MFS Intelenet* and *MCI Telecommunications v. U.S. West Communications, supra.* Even if district courts do have jurisdiction of takings claims under the Telecom Act, that would not exclude the Court of Federal Claims, *ipso facto,* from also exercising jurisdiction over such claims. Neither the Eighth or Ninth Circuits, nor the U.S. District Court for the District of Minnesota, in discussing district court jurisdiction of takings claims under 47 U.S.C. § 252(e)(6), expressed any views about the historic jurisdiction of this court to entertain takings claims under the Tucker Act.

### III.

■ The Court of Federal Claims has jurisdiction under the Tucker Act to hear takings claims absent clearly expressed Congressional intention to the contrary. As the Supreme Court stated in *Blanchette v. Connecticut General Insurance Corporations,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), a case involving railroads in bankruptcy that challenged the constitutionality of a law (the Regional Rail Reorganization Act) requiring the railroads to transfer assets to a new consolidated railroad company in exchange for compensation to be set by a special court which they feared would be inadequate,

"[t]he question is not whether the Rail Act expresses an affirmative showing of congressional intent to permit recourse to a Tucker Act remedy. Rather it is whether

Congress has in the Rail Act withdrawn the Tucker Act grant of jurisdiction to the Court of Claims to hear a suit involving the Rail Act 'founded .... upon the Constitution.' "

419 U.S. at 126, 95 S.Ct. 335. The Supreme Court went on to declare that:

"One canon of construction is that repeals by implication are disfavored. (Internal citations omitted). Rather, since the Tucker Act and the Rail Act are 'capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to reward each as effective.' [Internal citation omitted.] Moreover, the Rail Act is the later of the two statutes and we agree with the Special Court: 'A new statute will not be read as wholly or even partially amending a prior one unless there exists a 'positive repugnancy' between the provisions of the new and those of the old that cannot be reconciled ....' "

*Id.* at 133–34, 95 S.Ct. 335.

■ Applying this reasoning to the case at bar, it is clear that Congress did not withdraw the Tucker Act jurisdiction of the Court of Federal Claims to hear Fifth Amendment takings claims arising under the Telecom Act. There is no reference to the Tucker Act or takings claims in the judicial review provision, 47 U.S.C. § 252(e)(6), or anywhere else in the Telecom Act. So, even if the judicial review provision is construed as empowering federal district courts to hear takings claims under the Telecom Act, there is no basis to conclude that Congress explicitly meant to withdraw the Tucker Act jurisdiction of the Court of Federal Claims to hear those claims as well. Nor is there any basis to conclude that Congress implicitly intended to withdraw a Tucker Act remedy in the Telecom Act. Section 601(c)(1) of the Telecom Act plainly refutes such a contention by providing as follows:

"NO IMPLIED EFFECT.—This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law un-

less expressly so provided in such Act or amendments." 47 U.S.C. § 152 note.

The Tucker Act and the Telecom Act are perfectly capable of co-existence, and the Tucker Act long predates the Telecom Act. There is nothing irreconcilable between the statutes in permitting an ILEC to seek "just compensation" in the Court of Federal Claims under the Tucker Act for an alleged taking of its loops (or any other property it is forced to lease to a competitor), even though the ILEC may seek the same relief in a federal district court under the Telecom Act. This would simply be an instance of concurrent jurisdiction, which the Court of Federal Claims already has with district courts in a number of legal areas, such as tax refund actions, 28 U.S.C. § 1346(a)(1), and claims under $10,000, 28 U.S.C. § 1346(a)(2).[5]

Another instructive case is *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). In that case, which involved a taking by the Environmental Protection Agency of a chemical company's trade secrets pursuant to the data-consideration and data-disclosure provisions of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), as amended, the statute provided for compensation, at least in part, through an arbitration procedure. The Supreme Court observed that "[n]owhere in FIFRA or in its legislative history is there discussion of the interaction between FIFRA and the Tucker Act." 467 U.S. at 1017, 104 S.Ct. 2862. Interpreting pertinent statutory language dealing with the arbitration proceeding, the Supreme Court reasoned that "FIFRA does not withdraw the possibility of a Tucker Act remedy, but merely requires that a claimant first seek satisfaction through the statutory procedure. Cf. *Regional Rail Reorganization Act Cases,* 419 U.S. at 154–56, 95 S.Ct. 335 .... (viewing Tucker Act remedy as covering any shortfall between statutory remedy and just compensation)." *Id.* at 1018, 104 S.Ct. 2862. The Court went on to state that:

"Congress in FIFRA did not address the liability of the Government to pay just compensation should a taking occur. Con-

---

**5.** Indeed, the instant litigation would appear to qualify for concurrent jurisdiction since the amount of compensation claimed—$208.64 per month for the 14 loops since October 1999—is currently well below $10,000.

gress' failure specifically to mention or provide for recourse against the Government may reflect a congressional belief that use of data by EPA in the ways authorized by FIFRA effects no Fifth Amendment taking or it may reflect Congress' assumption that the general grant of jurisdiction under the Tucker Act would provide the necessary remedy for any taking that may occur. In any event, the failure cannot be construed to reflect an unambiguous intention to withdraw the Tucker Act remedy."

*Id.* at 1018–19, 104 S.Ct. 2862.

■ The case at bar presents a similar scenario, in that Congress in the Telecom Act did not specifically address the issue of compensation for any physical taking of an ILEC's property. While the judicial review provision, 47 U.S.C. § 252(e)(6), could be interpreted as vesting district courts with jurisdiction to consider physical takings claims, the language is cloudy at best. As the Supreme Court speculated in *Monsanto* with respect to FIFRA, Congress may have assumed that the Tucker Act's general grant of jurisdiction would provide the necessary remedy for a physical taking claim arising under the Telecom Act, or that the Telecom Act would not give rise to any physical takings claims at all. In any event, nothing in the language of the Telecom Act can be construed as an "unambiguous intention to withdraw the Tucker Act remedy." Nor can the Government convincingly argue that Qwest's pending claim is unripe for failure to exhaust the remedies provided in the Telecom Act. Qwest obtained an arbitration determination from the Colorado Commission, and does not contest that decision as failing to comply with sections 251 and 252 of the Act, which is the legal basis for judicial review in a federal district court under 47 U.S.C. § 252(e)(6). Thus, there is arguably no statutory basis for Qwest to bring this action in a federal district court. Since it is not clear whether physical takings claims are within the ambit of judicial review by a federal district court, and the plaintiff is "master to decide what law he will rely upon," *Bell v. Hood,* 327 U.S. at 681, 66 S.Ct. 773, *supra,*

the Court of Federal Claims is well justified in exercising its historic Tucker Act jurisdiction to hear this Fifth Amendment taking claim, especially since that remedy has been neither explicitly nor implicitly withdrawn by the Telecom Act.

The court concludes that it has jurisdiction of the instant claim under the Tucker Act.

### *Has there been a Physical Taking of Qwest's 14 Loops?*

I.

■ Defendant maintains that, even if this court has jurisdiction, there has been no physical taking, or any other taking, of Qwest's property on which to base a claim for just compensation under the Fifth Amendment. A brief survey of Supreme Court case law on "physical takings" and "regulatory takings" is in order.

It has long been held by the Supreme Court that when an owner's property is invaded and occupied by the government, or by a third party acting with government authorization, a physical taking has occurred requiring "just compensation" under the Fifth Amendment. As stated in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), "[W]e have long considered a physical intrusion by government to be a property restriction of an unusually serious character for purposes of the Takings Clause..... [W]hen the physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred." The Court also noted that "[a] permanent physical occupation of real property .... is a taking to the extent of the occupation without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner," *id.* at 419–20, 102 S.Ct. 3164, and regardless of how small a portion of the property is invaded or occupied. See *id.* at 438, 102 S.Ct. 3164. Furthermore, "a permanent physical occupation authorized by state law is a taking without regard to whether the State, or instead a party authorized by the State, is the occupant." *Id.* at 432, 102 S.Ct. 3164.[6] In other words, a per-

6. The 5th Amendment principle that the federal

government shall not take private property

manent physical occupation of property is a *per se* taking. In addition, case law establishes that *temporary* physical takings are compensable under the Fifth Amendment as well. See *United States v. General Motors Corp.,* 323 U.S. 373, 374, 65 S.Ct. 357, 89 L.Ed. 311 (1945); *Kimball Laundry Co. v. United States,* 338 U.S. 1, 6, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949); *United States v. Pewee Coal Co.,* 341 U.S. 114, 115, 71 S.Ct. 670, 95 L.Ed. 809 (1951); and *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 319, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). "Temporary takings," the Supreme Court said in the latter case, ". . . . are not different in kind from permanent takings, for which the Constitution clearly requires compensation." *First English Evangelical Lutheran Church,* 482 U.S. at 319, 107 S.Ct. 2378.

Government regulation of property which does not involve any physical invasion or occupation can also amount to a taking if the regulation has the practical effect of denying the owner the economically viable use of his property. As Justice Oliver Wendell Holmes stated in *Pennsylvania Coal v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922), "[w]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." In relatively rare instances, such as *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), government regulation may result in a total loss of economic use by the property owner. In *Lucas,* where state regulators prevented an owner from developing his waterfront property in any manner, the Supreme Court stated that "total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation." *Id.*

at 1017, 112 S.Ct. 2886. The Court went on to say that "when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." *Id.* at 1019, 112 S.Ct. 2886. Such a taking by regulation is called a total, or categorical, regulatory taking.[7]

Most government regulation, however, does not have such a draconian effect on the rights of property owners. Regulations typically restrict or prohibit only some of the economically beneficial uses an owner may make of his property. In such cases owners may nonetheless argue that their property has been so unfairly burdened as to constitute a "partial taking," entitling them to just compensation for the property's diminution in value. The seminal case on partial takings was *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), in which the Supreme Court had to rule on the constitutionality of a New York City landmark protection ordinance that placed development restrictions on designated historic properties (in that case Grand Central Terminal). The Court noted that there was no "set formula" for determining when "economic injuries caused by public action" must be compensated and that the question of when a taking has occurred "depends largely upon the particular circumstances" of each individual case. *Id.* at 124, 98 S.Ct. 2646.

Nevertheless, the Supreme Court identified three key factors in *Penn Central* for determining whether regulatory action effects a partial taking: (1) the economic impact of the regulation on the property owner, (2) the extent to which the regulation interfered with the owner's investment-backed ex-

---

"without just compensation" is applied to the states through the due process clause of the 14th Amendment ("nor shall any state deprive any person of life, liberty, or property, without due process of law"). U.S. CONST. Amend. XIV Sec. 1; see *Nollan v. California Coastal Commission,* 483 U.S. 825, 827, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987).

**7.** *Lucas* also articulated a caveat to the total taking rule, holding that a property owner may not be entitled to compensation for a total regu-

latory taking if the government could "identify background principles of [state] nuisance and property law that prohibit the uses [the owner] now intends in the circumstances in which the property is presently found." *Id.* at 1031, 112 S.Ct. 2886. That is, no compensation would be owed if the regulation simply makes explicit the limitations on use that a state's nuisance or property laws impose on all owners in the jurisdiction.

pectations, and (3) the character of the governmental action. See *id.* at 124, 98 S.Ct. 2646. In reference to these factors, the Court observed that "a use restriction on real property may constitute a 'taking' if not reasonably necessary to the effectuation of a substantial public purpose .... or perhaps if it has an unduly harsh impact upon the owner's use of the property." *Id.* at 127, 98 S.Ct. 2646. The owner's reasonable expectations with respect to the beneficial use of the property were also key in determining whether the line had been crossed from legitimate government regulation to a taking. See *id.* at 136, 98 S.Ct. 2646. Thus, the Court employed a balancing analysis between the rights of property owners to use their property as they wished and the government's right to regulate that use for the common good. In *Penn Central* the Supreme Court weighed these factors and came down on the side of New York City, holding that the historic preservation ordinance did not effect a taking of Grand Central Terminal because "[t]he restrictions imposed are substantially related to the promotion of the general welfare and not only permit reasonable beneficial use of the landmark site but also afford [the owners] opportunities further to enhance the Terminal site [and neighboring properties]." *Id.* at 138, 98 S.Ct. 2646.

## II.

In the case at bar, Qwest does not claim that its 14 loops have been subject to a regulatory taking. Rather, plaintiff argues that its loops have been subject to an outright physical taking—entitling Qwest to "just compensation" under the Fifth Amendment—because the federal government has required Qwest, pursuant to the Telecom Act, to transfer virtually all indicia of ownership, including physical control and exclusive use of the loops, to a competitor. In particular, section 251(c) of the Telecom Act, as implemented by the FCC, obligated Qwest to unbundle the loops requested by TCG, transfer them to TCG via the "lift and lay" procedure, and lease them to TCG on a monthly basis. When TCG "purchased" access to the UNE loops, plaintiff argues, the two most fundamental property rights inherent in those loops—the power to control their use

and the power to exclude others—vested in TCG. At oral argument plaintiff's counsel asserted that the loops have been physically taken because "[f]irst, there is the detaching from [Qwest] and attaching to [TCG's] network. Second, that gives TCG all control over the loop[s]..... Third, now it is TCG's communication [facility]." Transcript at 21.

In determining whether plaintiff's property has been subject to a physical taking, our initial inquiry must focus on the nature of the property at issue. What are the physical assets involved? As previously described, the 14 loops are twisted copper wires, owned by Qwest, which run from the Lakewood customer's premises to a switch at Qwest's central office. At oral argument plaintiff's counsel provided further details of the "lift and lay" procedure whereby the loops were transferred from Qwest's network to TCG's. When TCG leased the loops, "Qwest was required physically to detach those loops from its own network and run the loops to a point of presence that TCG had in [Qwest's] switching office to TCG's own network and physically attach [them] to TCG's [equipment]." The distance was only "a matter of feet," plaintiff's counsel indicated. Qwest was "required to provide TCG space within [its] switching office..... Usually there [are] six-foot by six-foot fenced-in cages called collocation cages." Qwest "get[s] paid a small amount for that." Transcript at 9–10. So the property involved consists of a six foot square collocation cage on Qwest's premises, the associated wire or wires connecting the collocation cage with TCG's network, and the copper wire loops running from the collocation cage to the Lakewood customer.

Plaintiff's counsel made clear, however, that Qwest's physical taking claim relates only to the 14 loops it owns which serve the Lakewood customer. Responding to an inquiry from the court, plaintiff's counsel confirmed that Qwest's physical taking claim is based on "switching the loops and having [TCG] take over all attributes of ownership ...." Transcript at 29–30. With respect to the collocation cage, "that has been the subject of litigation," plaintiff's counsel stated, "and [Qwest] get[s] just compensation for that separately." In response to a further

inquiry from the court—"You are not seeking compensation for [the cage] here?"—plaintiff's counsel answered "No." *Id.* at 30. As for the wiring connecting the collocation cage with TCG's network, Qwest has not identified this item as a separate and distinct element of its physical taking claim. The court presumes that any taking claim based on a TCG cable occupying space on Qwest's premises would have been resolved as part of the compensation TCG paid to Qwest for the collocation cage. So Qwest's claim in the case at bar is just for the 14 loops.

### III.

Defendant argues that there has been no physical taking of Qwest's property. Qwest was simply required to lease some of its loops to a CLEC. Nothing was attached or affixed to Qwest's property. Nor was Qwest forced to allow TCG to enter its property and take over the loops, since Qwest itself made the connections by "lifting and laying" the 14 loops to TCG's equipment collocated in Qwest's central office. Thus, there has been no invasion or occupation of Qwest's property, as required to find a physical taking. In defendant's view, the government has merely placed a restriction upon how Qwest may *use* its property, *i.e.*, a valid regulation.

Defendant cites Supreme Court case law affirming the principle that not all regulatory restrictions on property rise to the level of a taking. In *Andrus v. Allard,* 444 U.S. 51, 66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), the Court stated that:

> "government regulation—by definition—involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by purchase."

In *Loretto v. Teleprompter Manhattan CATV Corp., supra,* 458 U.S. at 441, 102 S.Ct. 3164, the Supreme Court drew the legal distinction between a permanent physical occupation of property, which is a taking, and a restriction on the use of property that does not amount to a taking:

"Our holding today is very narrow. We affirm the traditional rule that a permanent physical occupation of property is a taking. . . . . We do not, however, question the equally substantial authority upholding a State's broad power to impose appropriate restrictions upon an owner's use of his property."

In short, defendant maintains that plaintiff's 14 loops have been subjected to legitimate government regulation, not a physical taking.

### IV.

In support of its argument that the 14 loops have been physically taken, Qwest places great weight on the Supreme Court's landmark decision in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, *supra.* That case involved a New York State law granting a cable television company the right to install necessary wiring and equipment on rental properties in Manhattan. Building owners were prohibited from denying access to the cable companies or otherwise interfering with the installed equipment and were granted a one-time nominal payment from the company of one dollar. Loretto owned a five-story apartment building, to which Teleprompter attached plates, boxes, wires, bolts and screws to space on and immediately above the roof and along the building's exterior wall. The installations included two metal boxes with a volume somewhat in excess of one and a half cubic feet and a cable approximately 35 feet in length. Even though the space occupied by the cable equipment was quite small, the Supreme Court found that a bundle of property rights were taken from the building owner, including the rights "to possess, use and dispose of" the affected property. 458 U.S. at 435, 102 S.Ct. 3164. In particular, the Court found that (1) the owner had no right to possess the occupied space or to exclude the occupier therefrom, (2) the owner had no power to control the use of the rooftop space, and (3) though legal title to the rooftop space remained with the building owner, the permanent occupation thereof by another emptied it of resale value to any potential purchaser of the building. *Id.* at

435–36, 102 S.Ct. 3164. Thus, the Court held that the state-sanctioned occupation of plaintiff's rooftop space by the cable company was a physical taking, requiring just compensation from the State of New York for the occupied space.

*Loretto* presents a similar factual situation to the case at bar insofar as the property claimed to be taken was only a small segment of the owner's total property (there Loretto's minimal rooftop space, here Qwest's 14 loops out of thousands serving its customers in a 14–state region). However, there are also some important distinctions between the two cases. In *Loretto,* the Supreme Court held that "the cable installation on appellant's building constituted a taking under the traditional physical occupation test, since it involved a direct physical attachment of plates, boxes, wires, bolts, and screws to the building, completely occupying space immediately above and upon the roof and along the building's exterior wall." 458 U.S. at 420, 102 S.Ct. 3164. The cable company came onto Loretto's property to perform the installation, and all the equipment affixed to the rooftop belonged to the cable company. In the case at bar, the six foot square cage collocated on Qwest's premises (and associated wiring from the cage to TCG's network) is analogous to the rooftop equipment in *Loretto.* But Qwest has already received "just compensation" for the space taken by the collocation cage, as plaintiff acknowledged at oral argument, *supra.* (As aforementioned, no separate claim is made for space taken by associated wiring to TCG's network, which may be subsumed in the collocation cage compensation.)

So the only equipment on which Qwest bases its taking claim are the 14 loops. These loops were not installed by TCG, however, and are not TCG's property (in contrast to the rooftop equipment installed and owned by the cable company in *Loretto* ). The loops were installed by Qwest, they are still owned by Qwest, and they are leased to TCG at a fixed monthly rate. When use of the loops (to service the Lakewood customer) was transferred from Qwest to TCG, it was a Qwest technician who performed the "lift and lay" procedure. No TCG technician entered Qwest's premises to perform that task. Moreover, it is Qwest, not TCG, that continues to operate and maintain the loops on behalf of its lessee. Thus, TCG did not affix the 14 loops to Qwest's property (they were already there), does not own them, and does not service them. Accordingly, the court does not view TCG's leasehold use of the 14 loops as a physical invasion or occupation of Qwest's property by TCG, which is the *sine qua non* for finding a physical taking under *Loretto.*

## V.

In recent years several courts have addressed the question of whether mandatory access and co-location provisions of federal or state law, as implemented by federal or state authorities, constitute a physical taking of the affected utility's property. *Bell Atlantic Telephone Companies, et al. v. Federal Communications Commission,* 24 F.3d 1441 (D.C.Cir.1994), decided prior to the enactment of the Telecommunications Act of 1996, involved an FCC order issued under the Communications Act of 1934, 47 U.S.C. § 201, *et seq.* (1988), that required local telephone exchange companies (LECs) to make space available in their central offices for "competing access providers" (CAPs) to connect their facilities to the LEC networks through physical or virtual co-location. Physical co-location was made mandatory by the FCC order unless (1) a LEC could show that its central office lacked enough space to accommodate co-location or (2) a competent state authority issued a decision allowing virtual co-location for intrastate interconnection. The difference between physical and virtual co-location was explained by the D.C. Circuit:

"In physical co-location, the CAP strings its cable to the LEC central office. The LEC must then turn over space within the central office in which the CAP may install and operate its circuit terminating equipment. In virtual co-location, the LEC owns and maintains the circuit terminating equipment, but the CAP designates the type of equipment that the LEC must use and strings its own cable to a point of

interconnection close to the LEC central office."

24 F.3d at 1444.

"Under either virtual or physical co-location the CAP physically connects to the LEC network by a cable that runs to circuit terminating equipment in the LEC office. The difference between the two schemes is a difference in ownership and right of occupancy; under virtual co-location the LEC owns and operates the circuit terminating equipment, whereas under physical co-location the CAP owns the equipment and enjoys a right to occupy a portion of the LEC office in order to maintain the equipment."

*Id.* at 1446.

The D.C. Circuit found that "[t]he [FCC's] decision to grant CAPs the right to exclusive use of a portion of the [LEC's] central offices *directly implicates the Just Compensation Clause of the Fifth Amendment,* under which a 'permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve. *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164'" *Id.* at 1445 (emphasis added). The measure of just compensation was not further discussed, however, because the court struck down the co-location order on the grounds that the Communications Act of 1934 did not give the FCC authority to issue it.[8]

Another key case was *GTE Northwest, Inc. v. Public Utility Commission of Oregon,* 321 Or. 458, 900 P.2d 495 (1995), *cert. denied,* 517 U.S. 1155, 116 S.Ct. 1541, 134 L.Ed.2d 646 (1996), which also predated the Telecommunications Act of 1996. In that case the Supreme Court of Oregon, *en banc,* held that rules adopted by Oregon's Public Utility Commission (PUC) requiring LECs to offer physical or virtual "collocation" to competing enhanced service providers (ESPs) would effect a taking under the Fifth Amendment, but that the PUC lacked the statutory authority to issue such rules. Like the D.C.

8. The *Bell Atlantic* decision prompted Congress to include a "collocation" provision in the Telecommunications Act of 1996. The Telecom Act mandated the physical or virtual collocation of

Circuit in *Bell Atlantic,* therefore, Oregon's high court invalidated the offending rules.

The court identified three reasons for finding that collocation "can be characterized as a physical invasion by [the] government," within the meaning of *Loretto,* 458 U.S. at 426, 102 S.Ct. 3164.

"First, collocation by definition involves the 'installation of a[n ESP's] equipment, software, and databases on LEC premises.' [Internal citation omitted.] .... Under the collocation rules, an LEC is required to accept a 'direct physical attachment' to the property." [Internal citation omitted.]

. . . .

The second reason .... is that, under the rules, it is the ESP, not the LEC, that owns the equipment placed on the LEC's property..... The Court in Loretto relied on whether the property owner, or a third party, owned the cable boxes in deciding whether a physical invasion had occurred.....

The third reason .... is that the rules require an LEC to provide collocation to an ESP that requests collocation. " 'This element of required acquiescence is at the heart of the concept of occupation.' " [Internal citation omitted.]

900 P.2d at 503–04.

In further elucidation of the law regarding physical takings, the court also noted that "[t]he duration of the 'taking' by physical invasion is not relevant to the determination of whether a 'taking' has occurred." *Id.* at 504. Furthermore, "the facts that an industry is heavily regulated, and that a property owner acquired the property knowing that it is heavily regulated, do not diminish a physical invasion to something less than a taking." *Id.* For all of the above reasons, the Supreme Court of Oregon concluded that "[t]he challenged collocation rules effect a taking under Loretto." *Id.* at 506. As previously indicated, the U.S. Supreme Court denied PUC's petition for a writ of certiorari to challenge the Oregon high court's invalidation of the rules.

equipment necessary to effectuate a CLEC's interconnection with the ILEC's network and access to its unbundled network elements. 47 U.S.C. § 251(c)(6).

In *Gulf Power Company, et al. v. United States, Federal Communications Commission,* 187 F.3d 1324 (11th Cir.1999), *cert. granted* —— U.S. ——, 121 S.Ct. 878, 148 L.Ed.2d 788 (2001), a number of electric utilities challenged an amendment to the Pole Attachment Act, enacted as part of the Telecommunications Act of 1996, mandating that utilities allow cable companies or telecommunications carriers to occupy physical space on their poles, ducts, conduits, and rights-of-way. The Eleventh Circuit upheld a district court ruling that the mandatory access provision of the Telecom Act, 47 U.S.C. § 224(f)(1), effected a taking of Gulf Power's property under *Loretto.* "Such a permanent, physical occupation of property," the court ruled, "falls squarely within the *Loretto* rule." 187 F.3d at 1329.

The court went on to state that "the fact [that] a utility gained its property knowing it would be subject to extensive regulation for the public use does not mean its property may by taken for a public purpose without payment of just compensation, however laudable that public purpose might be." The Eleventh Circuit cited the Oregon Supreme Court's similar ruling in *GTE Northwest, supra,* and quoted the pertinent language therein: "[T]he facts that an industry is heavily regulated, and that a property owner acquired the property knowing that it is heavily regulated, do not diminish a physical invasion to something less than a taking." 900 P.2d at 504. "However laudatory its motive," the Eleventh Circuit ruled, "Congress' power to regulate utilities does not extend to taking without just compensation the right of a utility to exclude unwanted occupiers of its property..... In sum, .... the mandatory access provision effects a per se taking of property under the Fifth Amendment." 187 F.3d at 1331. That being said, the court also held that the subject amendment to the Pole Attachment Act provided an adequate process for obtaining just compensation, as required by the Fifth Amendment.

Though none of the three cases just discussed is binding on this court, they illustrate that state and federal courts alike view the implementation of mandatory access provisions requiring a telecommunications provider or utility to make space available on its premises for a competitor to affix its own equipment as constituting a physical taking under *Loretto.* The installation by TCG of its collocation cage at Qwest's central office represents a similar physical taking. It satisfies the three-part test set forth by the Oregon Supreme Court in *GTE Northwest* because (1) the cage is directly attached to and occupies space on Qwest's premises, (2) the cage is owned by TCG, and (3) Qwest was required to acquiesce in the occupation of its property by the TCG cage.

But that is not the claim before this court. Qwest, by its own admission, has already received just compensation for its collocation cage. Qwest's claim in this action is for the 14 loops that were switched from Qwest's network to TCG's network. These loops do not meet the criteria for a physical taking under *GTE Northwest,* however, because (1) they were not affixed to Qwest's premises by TCG, (2) they are not owned by TCG, and (3) Qwest was not required to acquiescence in the occupation of its premises by *another party's* equipment. The subject loops were installed by Qwest, are owned by Qwest, and are serviced by Qwest. Thus, they are not another party's property or equipment that has occupied or been affixed to Qwest's premises.

Accordingly, *Bell Atlantic, GTE Northwest,* and *Gulf Power* do not provide a legal rationale for finding that Qwest's 14 loops have been subject to a physical taking.

VI.

Plaintiff argues that physical takings are not limited to "invasions" of property that involve placing an unwanted physical structure on the owner's premises. Qwest contends that its 14 loops are "invaded" by electrons that traverse the loops every time TCG originates or terminates a telephone call. TCG has exclusive control over the flow of electrons through the loops because the loops have been connected exclusively to TCG's network. This unwanted movement of telecommunications traffic across its loops, plaintiff maintains, constitutes a government-authorized physical taking of Qwest's proper-

ty.[9] The court is not convinced. While *Loretto, Bell Atlantic, GTE Northwest,* and *Gulf Power* firmly establish that the government-mandated co-location of one party's equipment on another party's premises constitutes a physical taking of the occupied space—because physical objects owned by one party have invaded and occupied physical space owned by the other—it is another question entirely whether the telecommunications traffic (*i.e.,* electrical impulses) of a competing carrier on the host carrier's equipment pursuant to a mandatory lease can be considered a "physical taking" of that equipment. There is no precedent for finding that the compulsory lease of UNEs, like the 14 local loops at issue here, constitutes a "physical taking" of the subject equipment, and the court is not persuaded by plaintiff's "electron theory" that the telecommunications traffic TCG generates on the 14 loops it leases from Qwest constitutes a physical taking of the loops.

As mentioned prior to our discussion of *Loretto,* plaintiff cites other Supreme Court cases in support of its physical taking claim. In *Nollan v. California Coastal Commission,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), California authorities conditioned the grant of a building permit on the plaintiff's acquiescence in the creation of a public easement across its private beach. Although the easement did not deny the Nollans the use of their own property, and did not represent a continuous physical occupation, the Supreme Court held that a concrete property right—physical access to part of plaintiff's property—had been conveyed to the public. The Court quoted from its earlier *Loretto* opinion—"our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner"—and held that "a permanent physical occupation has occurred, with respect to that rule, where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed . . . ." 483 U.S. at 832, 107 S.Ct. 3141. Thus,

the imposition by the government of a public easement on plaintiff's property constituted a physical taking which necessitated the payment of just compensation.

Similar reasoning was applied in *Dolan v. City of Tigard,* 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), in which the Supreme Court found unconstitutional a municipal building permit that conditioned development of the property on the landowner's dedication of easements to the city for a bike path and greenway on a portion of the property. The Court stated that it would "[w]ithout question" be a (physical) taking, requiring compensation under the Fifth Amendment, if the government required an owner "to dedicate a strip of land . . . . for public use." 512 U.S. at 384, 114 S.Ct. 2309. "Such public access would deprive [the owner] of the right to exclude others, one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Id.* [internal quotation omitted].

Plaintiff contends that *Nollan* and *Dolan* are instructive because the Supreme Court found a taking in those cases when the government divested the owners of a single strand of their property rights—the right to exclude others. By contrast, plaintiff argues that Qwest has been deprived of much more by the 1996 Act: the rights to possess, access, and use its own loops, to exclude others from those facilities, and to control or limit the use of its loops. In plaintiff's view the Government has "chop[ped] through the bundle [of property rights Qwest had in its loops], taking a slice of every strand." *Loretto,* 458 U.S. at 435, 102 S.Ct. 3164.

In the court's view, however, these cases have minimal relevance to the instant litigation. The factual scenarios presented by *Nollan* and *Dolan* were radically different from the case at bar. *Nollan* and *Dolan* involved real property on which tangible physical invasions—the creation of public easements on private land—took place. Qwest's claim, by contrast, involves telecommunications equipment—14 local loops—sub-

9. For a more expansive discussion of this novel physical taking theory, plaintiff cites a 1996 article in the New York University Law Review. See

J. Gregory Sidak & Daniel F. Spulber, *Deregulatory Takings and Breach of the Regulatory Contract,* 71 N.Y.U.L. REV. 851, 951–53 (1996).

jected to governmental regulations under the Telecom Act, which required that the subject equipment be leased to a requesting competitor. The fact that TCG currently has exclusive possession, use, and control of the loops is the logical result of any lease arrangement, for which Qwest, as lessor, receives value in the form of monthly lease rates from the lessee, TCG. The takings analogies of *Nollan* and *Dolan,* in other words, are not on point with the lessor/lessee relationship of Qwest and TCG created by the Telecom Act.

## VII.

As another variant of its physical taking argument, Qwest asserts that its 14 loops have been taken because TCG, with the express authorization of the government, has assumed exclusive control of the loops and is using them for its own business purposes. Plaintiff invokes a line of Supreme Court cases holding that when the government appropriates a privately-owned business for its own purposes, a taking has occurred requiring just compensation under the Fifth Amendment. In *Kimball Laundry Company v. United States,* 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949), the government took over a laundry plant during World War II and used it to clean the clothes of Army personnel. The government did not assume legal title to the plant, displace the company's facilities with its own equipment, or deny the property owners and their employees access to the plant. Instead, the Army took over and operated the plant as a "going concern," retaining one of the Kimball brothers to manage the business and many of the employees to work in it. For all practical purposes, however, the laundry owners retained none of the perquisites of ownership, since they could not carry on their own business, control what customers they served, or who was permitted on the property. The Court found that a taking had occurred, requiring just compensation. Moreover, it did not matter that the taking was only temporary—*i.e.,* for the duration of the war. "[W]hen the Government has condemned business property with the intention of carrying on the business, .... it must pay for it." 338 U.S. at 12, 69 S.Ct. 1434.

The Supreme Court issued a similar ruling in *United States v. Pewee Coal Co.,* 341 U.S. 114, 71 S.Ct. 670, 95 L.Ed. 809 (1951). In that case the government took over the operation of a coal mine in order to direct its operation during World War II. Despite the absence of any substantial governmental occupation (the mine was run essentially as it had been before the war), the Court found a taking on the grounds that fundamental attributes of ownership—the right to control and use one's own facilities for one's own purposes—had been transferred to the government. In *United States v. General Motors Corp.,* 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945), moreover, the Court found a taking even when the government took over and used only a small portion of the company's business property. That case involved the temporary taking of part of a leased warehouse building during the war. Regardless of the minuscule percentage of GMC's total business that was subject to the taking, the government was obligated to pay just compensation for that property.

Plaintiff argues that TCG's exercise of its rights under section 251(c)(3) of the Telecom Act to lease the 14 loops constituted a temporary taking of Qwest's business with the Lakewood customer, in the mold of *Kimball Laundry* and *Pewee Coal.* As in those cases, where the manning and operation of the business changed little during the period of government control, Qwest's employees continue to maintain and repair the facilities leased to TCG, but Qwest possesses none of the attributes of ownership in the business. It cannot decide what services are provided over its loops, it cannot control the flow of telecommunications traffic over the loops, and it cannot use the loops to provide its own services. Rather, TCG "fully occupies [the owner's] shoes," *Kimball Laundry,* 338 U.S. at 12–13, 69 S.Ct. 1434, has taken over the business with the Lakewood customer as a going concern, and is reaping the revenue stream from the loops that used to go exclusively to Qwest. In sum, the 14 loops and the business generated thereby have been subject to a government-authorized physical taking, plaintiff argues, akin to the precedents in *Kimball Laundry* and *Pewee Coal.*

In the court's judgment, these business-takings cases do not offer convincing rationales for finding a taking in the case at bar. *Kimball Laundry*, *Pewee Coal*, and *General Motors* all involved direct appropriations by the federal government during World War II. The government did not contest the fact of a taking in those cases, but rather the proper amount of damages to satisfy the Fifth Amendment requirement of just compensation. In *Kimball Laundry* and *Pewee Coal*, moreover, the government took over the owner's entire business enterprise. Qwest's loops present a different picture. In contrast to *Kimball Laundry* and *Pewee Coal*, the property at issue here—14 loops serving just one customer—represents a negligible percentage of Qwest's total business. While *General Motors* might initially seem more applicable to Qwest's case because in both actions the property at issue was a small portion of the entire business enterprise, the improved real property (warehouse space) appropriated by the government in *General Motors* is hardly analogous to the telecommunications equipment (14 copper wires) leased by Qwest to a private party in the case at bar. Unlike the property involved in the World War II cases, Qwest's property has not been appropriated by the government. Rather, 14 of its local loops have been leased to a private party as part of a broad bargain in the Telecommunications Act of 1996 that offers counterbalancing opportunities to Qwest over and above the compensation it receives from TCG under the lease.

## VIII.

In the final analysis, the question of whether the compulsory lease effected a physical taking of plaintiff's loops cannot be analyzed and decided in a vacuum. It must be considered in the context of the comprehensive legal framework established by the Telecom Act. The purpose of the Act, as previously discussed, was to foster increased competition in the entire telecommunications industry, thereby reducing consumer prices and spurring technological advances. To that end the Act opened the various telecommunications markets, which had up to then been regulated monopolies, to competition. With respect to telephone service, the Act obligated the Bell operating companies (ILECs), which had monopolized the local exchange services markets, to allow competing companies (CLECs) to interconnect with their networks and access their unbundled network elements. ILECs were entitled to receive "just and reasonable" rates from the CLECs.[10] In addition, the Act gave ILECs the chance to enter new markets—long distance telephone service and the manufacture of telecommunications equipment—which had previously been closed to them. Entry of an ILEC into these markets was conditioned on its first having opened up its local exchange market to competition, *i.e.*, by entering into an interconnection agreement with a CLEC. So the Telecom Act created a matrix of interlocking opportunities and obligations for ILECs like Qwest. They could enter some new markets, but the *quid pro quo* was that they open up their own local exchange markets to competition.

So the lease of Qwest's 14 loops to TCG is one small piece of the grand design laid out in the Telecommunications Act of 1996 to enhance competition in the various segments of the U.S. telecommunications industry.[11] The lease entitles TCG to use Qwest's loops for an indefinite time, but it does not transfer ownership or permanent possession thereof to TCG. The lease does not permit TCG to

10. The U.S. Congress, in considering the legislation, recognized that the imposition of mandatory access, interconnection, and other new pro-competitive requirements in the telecommunications industry would bear a cost for ILECs and would have to be compensated (whether by mutual agreements with competitors or by compulsory arbitration). In House Report No. 104–204, which accompanied the passage of the House bill H.R. 1555 in 1995, the House Commerce Committee wrote that the telecommunications bill "directs the [FCC] to establish regulations requir-

ing *full compensation* to the LEC for costs of providing services related to equal access, interconnection, number portability, and unbundling." House Report 104–204 at 73 (emphasis added).

11. Though the Act is now five years old, recent newspaper articles (*Washington Post*, January 24, 2001 and February 2, 2001) indicate that 93–95% of local telephone lines are still controlled by the Bell companies.

convey its use or control of the loops to a third party. Nor does the leasehold use involve any physical invasion or occupation of the loops by TCG, as that concept has been understood in relevant case law. As previously discussed, the "lift and lay" procedure which switched the loops from Qwest's network to TCG's was performed by a Qwest technician, not a TCG technician, and Qwest technicians continue to service the loops. The fact that Qwest currently has no physical use or control of the 14 loops is the logical consequence of any lease agreement. The lessor (Qwest) gives up use and control of the property for the duration of the lease, but receives in exchange the monthly rates paid by the lessee (TCG). In the court's judgment, therefore, Qwest retains sufficient indicia of ownership in the 14 loops to preclude a finding that they have been subject to a physical taking.

## IX.

Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Paxson Electric Company, Inc. v. United States*, 14 Cl. Ct. 634, 642 (1988); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). There are no disputed issues of material fact with respect to the terms of the Qwest/TCG Agreement, under which the 14 loops at issue are leased by Qwest to TCG, or the parties' respective rights in the loops during the leasehold. The parties do not disagree on any technical aspects of the interconnection agreement and TCG's use of Qwest's loops. Accordingly, the question of whether the loops have been subject to a physical taking can be decided as a matter of law. For the reasons discussed hereinbefore, the court concludes that there has been no physical taking of Qwest's 14 loops and that the Government is therefore entitled to summary judgment on this issue.

## CONCLUSION

Based on the foregoing discussion, the court makes the following determinations:

The court has jurisdiction of this claim under the Tucker Act. Defendant's motion to dismiss the claim for lack of jurisdiction is therefore DENIED.

Plaintiff's property has not been subject to a physical taking within the meaning of the Fifth Amendment. Plaintiff's motion for summary judgment is therefore DENIED.

Defendant's cross-motion for summary judgment is GRANTED. The clerk is ordered to enter judgment dismissing the complaint. No costs.