07-5553-ag
Cablevision Systems Corporation v. FCC

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2007

(Argued: April 7, 2008                      Decided: June 22, 2009)

Docket No. 07-5553-ag

------------------------------------------------------x

CABLEVISION SYSTEMS CORPORATION,

       Petitioner,

-- v. --

FEDERAL COMMUNICATIONS COMMISSION, UNITED STATES OF AMERICA,

       Respondents,

WRNN LICENSE COMPANY, LLC,

       Intervenor.

------------------------------------------------------x

B e f o r e :  WALKER, CABRANES, and RAGGI, Circuit Judges.

Petition for review of an order of the Federal Communications Commission directing petitioner Cablevision to carry the signal of television station WRNN pursuant to 47 U.S.C. § 534(a)-(b) & (h)(1)(C).  Cablevision argues that the Commission's decision contravenes the text and purpose of the statute, and that the statute, as applied, violated Cablevision's First and Fifth Amendment rights.

PETITION DENIED.

HENK BRANDS (Allan J. Arffa and J. Adam Skaggs, on the brief), Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, D.C., and Howard J. Symons and Tara M. Corvo (on the brief), Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Washington, D.C., for Petitioner.

JACOB M. LEWIS (Matthew B. Berry, Joseph R. Palmore, and Nicholas A. Degani, Federal Communications Commission, and Thomas O. Barnett, John J. O'Connell, Jr., Catherine G. O'Sullivan, and Robert J. Wiggers, U. S. Department of Justice, on the brief), Federal Communications Commission, Washington, D.C., for Respondent.

ANDREW G. MCBRIDE (Todd M. Stansbury and William S. Consovoy, on the brief), Wiley Rein LLP, Washington, D.C., for Intervenor.

Jane E. Mago, Marsha J. MacBride, and Erin L. Dozier (on the brief), National Association of Broadcasters, Washington, D.C., for Amicus Curiae National Association of Broadcasters.

JOHN M. WALKER, JR., Circuit Judge:

The must-carry provisions of the Cable Television Consumer Protection and Competition Act ("1992 Cable Act" or "Cable Act") require cable operators to transmit, over their cable systems, the signals of certain broadcast stations operating in the same market. The statute also gives the Federal Communications Commission ("FCC" or "the Commission") authority to modify a given broadcast station's market, thus potentially changing the universe of cable operators required to carry that station. In

2

this case, Cablevision, a cable systems operator, petitions for review of the FCC's decision to include certain Long Island communities in the market of WRNN, a station broadcasting from upstate New York, and the resulting order directing Cablevision to carry WRNN on its Long Island cable systems.  Because we find no constitutional or legal error in the FCC's decision, we DENY the petition.

**BACKGROUND**

**I.   The 1992 Cable Act and Its Must-Carry Provisions**

The must-carry provisions of the 1992 Cable Act require "cable operators," such as Cablevision, to carry the signals of a number of "local commercial television stations."  47 U.S.C. § 534(a).  The statute caps the number of such stations that a cable operator must carry at "up to one-third of the aggregate number of usable activated channels" on that operator's system.  Id. § 534(b)(1)(B).  For our purposes, a "local commercial television station" is a broadcast station (i.e., a station that transmits its signal over the airwaves) that, "with respect to a particular cable system, is within the same television market as the cable system."  Id. § 534(h)(1)(A).

A broadcast station's market "shall be determined by the Commission by regulation or order using, where available, commercial publications which delineate television markets based on viewing patterns."  Id. § 534(h)(1)(C)(i).  Currently, the

Commission relies on the commercial publications of Nielsen Media Research that divide the nation into a series of coterminous geographic "Designated Market Areas" ("DMAs") based on viewership patterns. 47 C.F.R. § 76.55(e)(2). For example, the New York City DMA contains not only the five boroughs of the city, but also neighboring areas of Long Island, Connecticut, New Jersey, and upstate New York, as well as limited areas of Pennsylvania, because people in those areas, in the aggregate, watch the same television channels.

The upshot of the must-carry provisions is that, in general, each cable operator is required to carry the signal of every broadcast station in its DMA, until it has dedicated "one-third of the aggregate number of usable activated channels" on its system to such channels. 47 U.S.C. § 534(b)(1)(B); see also id. § 534(a)-(b), (h)(1)(C). Both Cablevision and WRNN are located within the New York City DMA, and Cablevision currently has fewer than one-third of its channels dedicated to must-carry stations.

The only relevant exception to this must-carry rule occurs under the statute's market modification provision. Pursuant to this provision, the FCC may, on written request, add certain communities to, or exclude certain communities from, a given broadcast station's market "to better effectuate the purposes" of the statute. § 534(h)(1)(C)(i). If a given community is excluded from a station's market, cable operators in that community are no longer required to carry that station. If a

4

given community is added, cable operators in that community must commence carriage of that station's signal unless they already devote one-third of their channels to local broadcast stations. See id.

In considering market modification requests, the statute instructs the FCC to

> afford particular attention to the value of localism by taking into account such factors as--
> (I) whether the station, or other stations located in the same area, have been historically carried on the cable system or systems within such community; [the "historical carriage factor"]
> (II) whether the television station provides coverage or other local service to such community; [the "local service factor"]
> (III) whether any other television station that is eligible to be carried by a cable system in such community in fulfillment of the requirements of this section provides news coverage of issues of concern to such community or provides carriage or coverage of sporting and other events of interest to the community; [the "other stations factor"] and
> (IV) evidence of viewing patterns in cable and noncable households within the areas served by the cable system or systems in such community [the "viewing patterns factor"].

47 U.S.C. § 534(h)(1)(C)(ii)(I)-(IV). The FCC's interpretation and application of this provision lies at the heart of this dispute.

## II.   The Turner Litigation

Shortly after the passage of the 1992 Cable Act, several cable operators mounted a First Amendment challenge to the legislation by claiming that the statute, on its face, impermissibly burdened the rights both of cable programmers, who produce television shows exclusively for cable distribution

5

(e.g., HBO, TNT), and of cable operators, who actually transmit the programming to consumers via coaxial cable (e.g., Cablevision). In Turner Broadcasting System, Inc. v. FCC ("Turner I"), 512 U.S. 622 (1994), the Supreme Court held that the statute's requirements were content neutral, and therefore subject to intermediate scrutiny. The Court's majority opinion announced that, at least in the abstract, the statute served three "important," interrelated interests articulated by Congress in the statute's findings: "(1) preserving the benefits of free, over-the-air local broadcast television, (2) promoting the widespread dissemination of information from a multiplicity of sources, and (3) promoting fair competition in the market for television programming." Id. at 662. The majority, however, concluded that "deficienc[ies]" in the record prevented it from determining whether the statute was sufficiently tailored to further those interests without substantially burdening protected speech and remanded for further proceedings. Id. at 667-68.

Significantly, the majority noted that the district court had not addressed whether the language of the market modification provision, with its references to "the value of localism" and to stations "provid[ing] news coverage of issues of concern to such community," altered the content-neutrality of the statute. Id. at 643 n.6 (quoting 47 U.S.C. § 534(h)(1)(C)(ii)). The Court did not address this point. Id. In a dissent joined by three other justices, Justice O'Connor, relying in part on the language of

6

the market modification provision, wrote that the must-carry regulation was content-based, and thus subject to strict scrutiny, such that it could only be justified by a compelling governmental interest and would have to be narrowly tailored to achieve its intended purpose.  Id. at 680.

In 1997, with a more fully developed record before it, the Supreme Court held that "the must-carry provisions further important governmental interests" and that the provisions did not violate the First Amendment because they did "not burden substantially more speech than necessary to further those interests."  Turner Broad. Sys., Inc. v. FCC ("Turner II"), 520 U.S. 180, 185 (1997).  None of the opinions in Turner II specifically mentioned or cited the market modification provision.

**III. Market Modification Decisions in the New York City DMA**

In 1996, Cablevision petitioned the FCC to exclude a number of communities from the markets of several local broadcast stations, including WRNN, a station licensed in Kingston, New York that transmitted its signal from Overlook Mountain in Woodstock, New York.  The FCC's Cable Services Bureau (the "Bureau") granted Cablevision's request in part and denied it in part, excluding communities in Long Island's Nassau and Suffolk counties from WRNN's market, but declining to exclude communities elsewhere, such as New York's Westchester County and

7

Connecticut's Fairfield County.  Cablevision Sys. Corp. ("1996 CSB Order"), 11 F.C.C.R. 6453 (1996).  In making both decisions, the Bureau noted that, in the New York DMA, reliance on the four enumerated factors alone would not allow it to "take into account the particular difficulties faced by these stations in light of the purposes of the carriage rule."  Id. at 6475 ¶ 50.  Accordingly, the Bureau also considered the station's "Grade B contour," i.e., the area within which viewers can receive its broadcast signal over the air, and the "geography and terrain" separating the target communities from the broadcasting station.  Id. at 6480-81 ¶ 67.  In 1997, the FCC affirmed the Bureau's decision, noting that

> Grade B contour coverage, in the absence of other determinative market facts (i.e. where the four statutory factors by themselves define the market, where there is no clear proof that the contour fails to reflect actual coverage, or where there is a terrain obstacle such as a mountain range or a significant body of water) is an efficient tool to adjust market boundaries because it is a sound indicator of the economic reach of a particular television station's signal.

Market Modifications and the New York Area of Dominant Influence ("1997 FCC Order"),[1] 12 F.C.C.R. 12262, 12271 ¶ 17 (1997) (footnote omitted).

When WRNN and several other stations petitioned for review, this court endorsed the agency's reliance on Grade B contour in particular and factors not enumerated in the statute in general.

---

[1]     "Area of dominant influence" ("ADI") is the pre-2001 equivalent of the term "Designated Market Area" ("DMA").

8

We approved of the view that "the four factors [enumerated in the statute] are not exclusive," and we held that "[t]he FCC and the Cable Services Bureau, experts in the area of regulation of the television industry, carefully and properly analyzed the particular facts of the various petitions under the four factors listed in the statute and under non-statutory factors." WLNY-TV, Inc. v. FCC, 163 F.3d 137, 141-42 (2d Cir. 1998).

**IV.  The Current Proceedings**

Subsequent to the outcome of the 1996-98 proceedings, WRNN moved its transmitter to Beacon Mountain, New York, some 50 miles closer to Manhattan, and commenced digital-only broadcast operations.  In 2005, it petitioned the FCC to add back some of the communities in the New York City DMA in its market so that Time Warner Cable, which served the relevant communities, would have to carry WRNN on its system.  Relying primarily on Grade B contour and local programming, the FCC's Media Bureau (the successor to the Cable Services Bureau) granted WRNN's request. WRNN License Co., 20 F.C.C.R. 7904, 7911 ¶¶ 15, 16 (2005).  Time Warner Cable did not appeal the decision to the full Commission.

In 2006, relevant to the present review, WRNN petitioned for re-inclusion of several communities, this time served by Cablevision, in Long Island's Nassau and Suffolk Counties.  The Bureau denied the request as to a number of the Suffolk County communities based on WRNN's failure to comply with "standardized evidentiary requirements."  WRNN License Co. ("2006 Bureau

Order"), 21 F.C.C.R. 5952, 5956 ¶ 9 (2006). WRNN does not seek review of the Bureau's decision as to these communities. As to the remaining Nassau and Suffolk communities, which we will refer to as the "Long Island communities," the Bureau noted that the enumerated market modification factors did not offer strong support for WRNN's position. The parties vigorously disputed the amount of Long Island-specific programming WRNN offered, and the Bureau ultimately concluded that the local service factor weighed against carriage. As to the historical carriage factor, the Bureau found it insignificant that both cable systems in neighboring communities and digital broadcast satellite operators in the Long Island communities carried WRNN. It also accorded little weight to the fact that Verizon was scheduled to begin carrying WRNN on its FiOS system, which delivers television programming to subscribers over fiber optic phone lines, thus competing directly with cable television service. Nonetheless, the Bureau granted WRNN's request to include the remaining Long Island communities, noting that Commission precedent "instructs us to give little weight to the level of viewership [that] station[s] like WRNN achieve" and to treat Grade B contour as a "very relevant factor" when "the other [enumerated] factors would not add significantly to the analysis of a station's market." Id. at 5957 ¶ 10. In the Bureau's view, Grade B contour weighed decisively in WRNN's favor.

10

On appeal, the FCC affirmed the Bureau's order.  WRNN License Co. ("2007 FCC Order"), 22 F.C.C.R. 21054 (2007).  It disagreed with the Bureau's analysis of the local service and historical carriage factors, finding that those factors lent additional support to the Bureau's decision to include the Long Island communities in WRNN's market.  Id. at 21056 ¶ 4 & n.15.  The FCC also rejected Cablevision's claims that the Bureau's application of the market modification provision violated the First Amendment and the takings clause of the Fifth Amendment.  Id. at 21057-59 ¶¶ 7-10.  Cablevision filed a timely petition for review in this court.

**DISCUSSION**

In general, we will overturn an agency decision "only if it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Cellular Phone Taskforce v. FCC, 205 F.3d 82, 89 (2d Cir. 2000) (quoting 5 U.S.C. § 706(2)(A)).  "An agency's factual findings must be supported by substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (internal quotation marks omitted).  We review an agency's disposition of constitutional issues de novo.  See Rural Tel. Coal. v. FCC, 838 F.2d 1307, 1313 (D.C. Cir. 1988).

In its petition for review, Cablevision argues that the FCC's order improperly analyzed the statutory factors, that its

11

decision contravened the "purpose" of the must-carry statute, and that requiring Cablevision to carry WRNN violates the First and Fifth Amendments.  We address each of these arguments in turn.

**I.   The FCC's Analysis of the Section 534(h)(1)(C) Factors**

   **A.   The Local Service Factor**

Cablevision claims that the FCC failed to adequately explain its finding that WRNN provided significant programming targeted to the Long Island communities.  By insisting, however, that "at a minimum, the FCC was required to explain" why Cablevision's arguments and evidence to the contrary were "unpersuasive," Cablevision Br. at 35, Cablevision overstates an agency's duty to account for its actions.

An administrative agency has a duty to explain its ultimate action.  See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action.").  However, it need not explain each and every step leading to this decision; it is enough "if the agency's path may reasonably be discerned." Id.  at 43 (internal quotation marks omitted).  Here, the reason for the FCC's decision to affirm the Media Bureau's order is perfectly clear: it agreed with the reasoning of the Bureau in most respects and disagreed in certain others, but only in ways that strengthened the validity of the Bureau's decision.  In such circumstances, we will not require

the FCC to sift through each piece of evidence offered by a party and explain why it is more or less compelling than the counter-evidence put forth by an opponent.

The fact that we review agency fact-finding for "substantial evidence" supports our conclusion that the FCC's explanation was adequate. To determine whether substantial evidence supports a finding, we need ask only whether "a reasonable mind might accept [it] as adequate" support. Cellular Phone Taskforce, 205 F.3d at 89 (internal quotation marks omitted). Here, the agency found WRNN's evidence that it had significant Long Island-targeted programming to be more persuasive than Cablevision's evidence to the contrary. We need not know the agency's precise rationale in order to conclude that it was reasonable for the agency to so find. While such an explanation might have aided our reasonableness inquiry, it is not indispensable.

Both sides offered evidence regarding WRNN's programming content. According to Cablevision, its evidence showed that WRNN broadcast less than an hour of programming covering "Long Island issues" in a "representative week." Cablevision Br. at 33. WRNN pointed to evidence that it had aired over 4000 Long Island-related items between June and November 2005. It would be reasonable for the agency to resolve this conflicting evidence in favor of WRNN and to conclude (as it obviously did) that Cablevision failed to include some programming that should

13

properly be considered as local to Long Island, or that its sample week was not actually representative. Thus, substantial evidence supports the FCC's finding on this factor.

We note that the Bureau, on its initial consideration of this petition, made a contrary finding as to this factor. This fact, however, does not alter our assessment of the FCC's ultimate determination. "An agency conclusion may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." Robinson v. Nat'l Transp. Safety Bd., 28 F.3d 210, 215 (D.C. Cir. 1994) (internal quotation marks omitted). On questions of fact, our task on review is not to "displace [the agency's final] choice between two fairly conflicting views." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

**B.    The Historical Carriage Factor**

After the Bureau issued its 2006 Order, but before the FCC affirmed it, Verizon began carrying WRNN on its FiOS system to areas of Nassau and Suffolk Counties. 2007 FCC Order, 22 F.C.C.R. at 21056 ¶ 4 & n.15. The FCC concluded that this "overlapping carriage provides support for WRNN-DT with respect to the historic carriage factor." Id. at ¶ 4 n.15. In a single paragraph in its brief, Cablevision argues that this analysis is "contrary to clear statutory language" because "[c]arriage initiated in the past few months does not constitute historical

14

carriage." Cablevision Br. at 36-37.

Cablevision, however, fails to supply a contrary, "correct" definition of "historically carried," and does not discuss whether we should defer to the Bureau's interpretation of the term, in accordance with Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), as we did with the must-carry statute generally in WLNY-TV, Inc. v. FCC, 163 F.3d at 142. Even if Cablevision could demonstrate error in the sense that the Verizon carriage was not "historical," they have failed to show why such error would warrant vacatur given that (1) Cablevision does not contest the propriety of considering Verizon's carriage as an unenumerated, non-statutory factor, and (2) the Bureau decided to order carriage despite its belief that WRNN had not been "historically carried" in the relevant communities. Accordingly, we decline to vacate the FCC's order based on this asserted error in the FCC's analysis of the historical carriage factor.

**C.   Grade B Contour**

In its 1997 FCC Order involving Cablevision and WRNN, the Commission stated that "Grade B contour coverage, in the absence of other determinative market facts (i.e.[,] . . . a terrain obstacle such as a mountain range or a significant body of water), is an efficient tool to adjust market boundaries." 1997 FCC Order, 12 F.C.C.R. at 12271 ¶ 17. Cablevision contends that

the Hudson River, the Long Island Sound, and the "skyline of New York City" constitute such terrain obstacles, and it was therefore inconsistent with the 1997 FCC Order for the FCC and the Bureau to weigh Grade B contour in WRNN's favor here. Cablevision Br. at 38. The 1997 FCC Order itself forcefully rejects this reasoning, because it explicitly endorses the use of Grade B contour as proof of market in the New York City DMA-the same context in which Cablevision now contends that relying on Grade B contour is inappropriate. Because the 1997 FCC Order establishes, rather than refutes, the relevance of Grade B contour in market modifications within the New York City DMA, the FCC's decision here is consistent with its precedent.

### D.    The Other Stations and Viewing Patterns Factors

Cablevision also alleges error in the FCC's treatment of the two remaining statutory factors. In the instant order, the FCC stated that Congress did not intend "the 'coverage by other qualified stations' factor to bar a request for extending a station's market when other stations could be shown to serve the communities at issue." 2007 FCC Order, 22 F.C.C.R. at 21055-56 ¶ 4.

In essence, then, the FCC decided to give the factor significant weight when a lack of coverage by other stations favored including a community in a station's market, but to discount its importance when the existence of coverage arguably

16

cut against inclusion. Cablevision argues that this decision "is directly contrary to . . . the statutory text." Cablevision Br. at 40. This argument is unavailing. The text of the statute directs the agency to consider a number of factors, and it is clear from the opinion that both the FCC and the Bureau did consider this factor. Upon doing so, the FCC saw no reason to depart from its normal policy, which is to discount the "other stations' coverage" factor when it tends to cut against inclusion. Unsurprisingly, Cablevision cites no decision of this court vacating a decision because we disagree with an agency's weighing of a statutory factor. The law is to the contrary. In interpreting another provision of the 1992 Cable Act that directs the FCC to undertake a factoral analysis, the D.C. Circuit concluded that giving little or no weight to a statutory factor, as long as the factor is expressly considered, does not violate the statute:

> [T]he statute by its terms merely requires the Commission to consider the . . . factors . . . . That means only that it must reach an express and considered conclusion about the bearing of a factor, but is not required to give any specific weight to it. Therefore, when the Commission, after expressly considering the potential role of the . . . factor, ultimately concluded that it should not be given any weight, it did not violate the statute.

Time Warner Entm't Co. v. FCC, 56 F.3d 151, 175 (D.C. Cir. 1995) (internal quotation marks and citations omitted). This sound reasoning is equally applicable here.

Cablevision also argues that the FCC improperly weighed the

17

evidence with respect to the viewership patterns factor. This argument fails for the same reasons.

## II. The FCC's Consideration of the Purposes of the Must-Carry Statute

The market modification provision of the must-carry statute provides that the FCC may add or remove communities from a local broadcast station's market "to better effectuate the purposes of this section." 47 U.S.C. § 534(h)(1)(C)(i). Cablevision argues that the FCC's inclusion of the Long Island communities in WRNN's market contravened the purposes of must-carry in two ways. First, expanding WRNN's market in fact frustrates the goal of "localism" by necessarily decreasing programming relevant to the community WRNN has traditionally served (the Kingston community). And second, rewarding WRNN's actions with broader must-carry rights encourages gamesmanship which frustrates the purpose of must-carry, which is to preserve, but not expand, a broadcast station's market. We reject the first argument because it incorrectly presumes that WRNN cannot increase Long Island-targeted programming without decreasing Kingston-targeted programming. We reject the second because it rests on a conception of the statute's purpose that is overly narrow, unsupported by precedent, and contrary to the language of the statute.

18

According to Cablevision, the FCC's decision defeats the purposes of the must-carry statute because "[a]ny targeting of other spokes [i.e., communities that are remote from 'a DMA's metropolitan center'] necessarily comes at the expense of the station's community of license." Cablevision Br. at 43. This argument rests on the false premise that WRNN's programming consists entirely of either Kingston-specific programming or Long Island-specific programming. As Cablevision reminds us elsewhere, however, a great deal of WRNN's content is "home-shopping" programming that targets neither Kingston nor Long Island specifically. See Cablevision Br. at 33 (claiming that 78% of WRNN programming in a representative week "consisted of home shopping and infomercials"). It is entirely possible, and Cablevision does not suggest otherwise, that WRNN could increase its Long Island-targeted programming by decreasing its home-shopping programming, leaving its Kingston-targeted programming unaffected. And to the extent that a Kingston viewer might prefer certain home-shopping programming to programming concerning Long Island, we do not see how frustrating that preference undermines localism.

Essentially, Cablevision's claim is that, as a matter of law, a cable company in a community that is outside a "DMA's metropolitan center," such as Long Island, should not be required

19

to carry a station based in a different community that is also remote from the center, such as Kingston: in Cablevision's parlance, a "spoke" cable company should not be required to carry a station based in a different spoke. Congress, however, did not share that view, and, as the FCC points out, the default rule is that WRNN must be carried by cable operators throughout the New York City DMA. See 47 U.S.C. § 534(a)-(b), (h)(1)(C).

Cablevision also contends that the FCC's decision rewards "gamesmanship" because WRNN moved its transmitter and changed its programming simply to obtain must-carry privileges in other communities. Cablevision Br. at 46. In other words, they suggest that the FCC cannot award WRNN a regulatory benefit if WRNN has changed its conduct in an attempt to receive that benefit. This rule, applied universally, would run counter to a central premise of the regulatory scheme that a regulated entity will change its conduct in socially desirable ways to achieve a regulatory benefit. Accordingly, we reject it.

Cablevision also argues that any decision that increases a station's market is contrary to the purpose of the statute, because the purpose is "to return broadcasters to their 'natural market,'" Cablevision Br. at 47; thus, any FCC action which augments a broadcaster's market contravenes this purpose. The purpose of the statute, however, is not to "preserve" a group of broadcast stations, or a particular conception of a station's

20

market, but, <u>inter alia</u>, to "preserv[e] the benefits of free, over-the-air television," and "promot[e] the widespread dissemination of information from a multiplicity of sources." <u>Turner I</u>, 512 U.S. at 662. We do not think that these purposes are served only by granting broadcasters the minimum must-carry coverage necessary for survival; or that these purposes are frustrated by actions which result in a station's greater prosperity. Accordingly, we conclude that the FCC did not violate the statutory admonition that market modifications should be made "to better effectuate the purposes of this section." 47 U.S.C. § 534(h)(1)(C)(i). The remainder of Cablevision's arguments on this point fail to persuade us otherwise.

**III. Cablevision's First Amendment Challenge**

Cablevision argues that "compelled carriage of WRNN on Long Island violates the First Amendment on an as-applied basis." Cablevision Br. at 51. We think that the <u>Turner</u> cases do not foreclose the possibility of a successful as-applied First Amendment challenge to the 1992 Cable Act's market modification provisions. In this case, however, Cablevision has failed to demonstrate that the FCC applied the market modification provision unconstitutionally.

As a threshold matter, a party alleging violation of its First Amendment rights must show that the challenged government action actually regulates protected speech. Thus, in <u>Turner I</u>,

21

the Court found it necessary to establish, as an "initial premise," that "[c]able programmers and cable operators engage in and transmit speech," and that "the must-carry rules," in general, "regulate cable speech." 512 U.S. at 636. Similarly, Cablevision here must articulate how the FCC's order "interferes with [its] speech rights." Time Warner Entm't Co., 240 F.3d at 1129.

This threshold requirement serves two interrelated functions. Identifying the "burden" imposed by government action enables a court to undertake heightened scrutiny analysis: without understanding how a regulation burdens speech, a court cannot decide whether that burden is "no greater than is essential" to further the goals of the regulation in question. See United States v. O'Brien, 391 U.S. 367, 377 (1968). And the failure to identify the burden has an even more fundamental consequence: without a plausible allegation that the offensive conduct interferes with First Amendment rights or, put differently, that the interaction between government and citizen "bring[s] into play the First Amendment," id. at 376, a reviewing court has neither a reason nor the ability to subject the conduct of the governmental actor to heightened scrutiny.

The Turner I and Turner II Courts considered the First Amendment implications of the "must-carry provisions" taken as a whole, as distinguished from the market modification provisions

22

at issue here, and found that they posed two potential burdens on speech rights:

> First, the [must-carry] provisions restrain cable operators' editorial discretion in creating programming packages by reducing the number of cable channels over which they exercise unfettered control. Second, the rules render it more difficult for cable programmers to compete for carriage on the limited channels remaining.

Turner II, 520 U.S. at 214 (citation, alterations, and internal quotation marks omitted); accord Turner I, 512 U.S. at 637.

Cablevision raises a similar, but not identical, First Amendment challenge to that raised in Turner I and Turner II. Cablevision presents an as-applied First Amendment challenge to the FCC's order modifying the market of WRNN, pursuant to the provision of the must-carry statute on market determinations, 47 U.S.C. § 534(h)(1)(C)(ii). The challenged order threatens the First Amendment interest of Cablevision in a similar manner to that described in Turner I and Turner II. The order reduces the number of channels over which Cablevision exercises editorial control by forcing it to carry WRNN, see Turner II, 520 U.S. at 213, and it also makes it more difficult for the cable programming arm of Cablevision to compete for carriage on the remaining channels, id.

In order to apply the appropriate level of scrutiny, we must first determine whether the order is content based or content neutral. Turner I, 512 U.S. at 642. In Turner I, the Court concluded that the burdens imposed on cable operators as well as

23

the benefits conferred on broadcast channels were content neutral. See id. at 643-44 ("Although the provisions interfere with cable operators' editorial discretion by compelling them to offer carriage to a certain minimum number of broadcast stations, the extent of the interference does not depend upon the content of the cable operators' programming. The rules impose obligations upon all operators, save those with fewer than 300 subscribers, regardless of the programs or stations they now offer or have offered in the past."); id. at 645 (noting that the selection of broadcast channels that must be carried on the cable systems was "also unrelated to content").

The Turner I Court explicitly rejected the argument that "the must-carry regulations are content based because Congress' purpose in enacting them was to promote speech of a favored content." Id. at 646. Indeed, as the Court noted, when a cable system is required to "make room for a broadcast station, nothing would stop a cable operator from displacing a cable station that provides all local- or education-oriented programming with a broadcaster that provides very little." Id. at 648. However, separate from the must-carry provisions' general requirements, the Turner I Court expressly declined to decide whether a market modification order motivated by a concern for localism would be content based or content neutral. See id. at 644 n.6. The Court suggested that such an order might confer "special benefits on the basis of content." Id.

24

However, we think the order before us now is content neutral. WRNN's presumptive DMA would have included Nassau and Suffolk counties. It was Cablevision that first invoked the market modification provision to exclude these counties from WRNN's market. It succeeded based on the FCC's concern, in part, that WRNN lacked a Grade B contour reaching Long Island. When WRNN, after expanding its Grade B contour, returned to the FCC seeking restoration of its presumptive DMA, Cablevision argued that the station had failed to demonstrate that the various factors outlined in the market modification provision, including the local programming factor, weighed in WRNN's favor. The Bureau and the FCC reached different conclusions on this factor, yet both agreed that the totality of circumstances no longer justified excluding Long Island communities from WRNN's presumptive DMA. The FCC considered the amount of local programming provided by WRNN only in this context, i.e., in assessing the continued need to restrict a presumptive market defined solely by geography. Moreover, WRNN's local programming was an inconsequential factor in the FCC's ultimate decision. Additionally, Cablevision has not alleged, much less proven, that the restoration of the Long Island communities to WRNN's market under these circumstances was based on some illicit content-based motive. See id. at 652. We conclude, therefore, that the order is content neutral and deserving of intermediate scrutiny.

We have no trouble in concluding that the order "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further these interests." Turner II, 520 U.S. at 189 (citing O'Brien, 391 U.S. at 377). The burden imposed by the order - the loss of control over one channel - is no greater than necessary to further the government's interest in preserving a single broadcast channel it found serves the local community.

In sum, we conclude that the application of the market modification provision in this case does not violate the First Amendment. While we cannot rule out the possibility that the FCC's order might interfere with speech rights in other ways, Cablevision has presented neither factual support nor even a theory of any such additional infringement.

**IV.  Cablevision's Fifth Amendment Challenge**

Finally, Cablevision asserts that by ordering it to carry WRNN, the FCC effected a per se taking under Loretto v. Telepromter Manhattan CATV Corp., 458 U.S. 419, 426 (1982). The sine qua non of the takings analysis in Loretto, however, is "permanent physical occupation." Id. (emphasis added). This per se takings rule is "very narrow," id. at 441, and its touchstone is "required acquiescence" to the occupation of the property by an uninvited stranger or an "interloper with a government license." FCC v. Fla. Power Corp., 480 U.S. 245, 252-53 (1987);

26

see also Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 374 (2d Cir. 2006) ("Physical takings (or physical invasion or appropriation cases) occur when the government physically takes possession of an interest in property for some public purpose."). Our own test for whether a regulation constitutes a permanent physical occupation, set forth in Southview Associates, Ltd. v. Bongartz, 980 F.2d 85 (2d Cir. 1992), looks to (1) the permanency of the invasion, and (2) whether the invasion is an "absolute, exclusive physical occupation." Id. at 94-95. In turn, we must examine the nature of the interference with "the bundle of rights that constitute ownership," id. at 95, such as the right to possess and exclude, the right to control the use of the property, and the right to sell the property.

The initial determination - whether the invasion is physical - is primarily factual. Cf. John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1357 (Fed. Cir. 2006) ("[T]he determination of whether government occupancy is 'permanent' is highly fact-specific."). The fact finder must determine, in the first instance, whether any physical assets are involved. See, e.g., Qwest Corp. v. United States, 48 Fed. Cl. 672, 689 (2001) ("In determining whether plaintiff's property has been subject to a physical taking, our initial inquiry must focus on the nature of the property at issue. What are the physical assets involved?"). The FCC found that the transmission of WRNN over

27

the Cablevision system did not require installation of any equipment at Cablevision's facilities. "Rather, a programming stream is transmitted in bits of data over cable bandwidth through electrons or photons at the speed of light." 2007 FCC Order, 22 F.C.C.R. at 21058 ¶ 8. It further found that Cablevision "retains complete control over its property." Id. We see no reason to disturb these findings or the conclusion that the transmission of WRNN's signal does not involve a physical occupation of Cablevision's equipment or property. And Cablevision effectively conceded that this physicality is absent here when it argued in its reply brief that "[t]he result [under Loretto] should be no different when the occupation is not of a physical pipeline but of an electronic one." Cablevision Reply Br. at 25.

The amorphous nature of the alleged "taking" suggests that the takings claim here fits more comfortably within the Supreme Court's "regulatory taking" analytical framework. See Penn. Cent. Trans. Co. v. City of New York, 438 U.S. 104 (1978). In order to establish a regulatory taking, Cablevision was required to show that the regulation had an economic impact that interfered with "distinct investment-backed expectations." Id. at 124. Cablevision has presented no such evidence despite its "heavy burden" on this issue, Tobe, 464 F.3d at 375, and any regulatory taking theory must therefore fail.

**CONCLUSION**

Because we find no abuse of discretion or constitutional violation in the FCC's decision to include the relevant Long Island communities in WRNN's market for must-carry purposes, we DENY the petition for review. In accordance with our order of March 14, 2008, the stay of the FCC order pending judicial review is vacated, and the applicable deadline for Cablevision's compliance is one week from the issuance of the mandate in this case.