07-5739-cv
International Action Center v. City of New York

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT


August Term 2008


Argued:  March 6, 2009                    Decided:  November 17, 2009

Docket No. 07-5739-cv


- - - - - - - - - - - - - - - - - - - -

INTERNATIONAL ACTION CENTER,

             Plaintiff-Appellant,

             v.

CITY OF NEW YORK,

             Defendant-Appellee.

- - - - - - - - - - - - - - - - - - - -


Before: PARKER, Circuit Judge, and CHIN, District Judge.*

        Appeal from a judgment of the United States District
Court for the Southern District of New York (Stein, District J.)
granting in part and denying in part defendant-appellee's motion
for summary judgment.  Plaintiff-appellant contends,

---

        *        Honorable Denny Chin, United States District Judge for
the Southern District of New York, sitting by designation.  The
Honorable Sonia Sotomayor, originally a member of this panel, was
elevated to the United States Supreme Court on August 8, 2009.
The two remaining members of the panel, who are in agreement,
have decided this appeal.  See 28 U.S.C. § 46(b); Local Rule §
0.14(b).

inter alia, that the district court erred in concluding that a New York City regulation banning new parades on Fifth Avenue does not violate the First Amendment.

AFFIRMED.

> Jeffrey E. Fogel, Esq., Charlottesville, Virginia (Gideon Orion Oliver, Esq. and Palyn Hung, Esq., New York, New York, on the brief), for Plaintiff-Appellant.

> Scott Shorr, Esq. (Ronald E. Sternberg, Esq., on the brief), for Michael A. Cardozo, Corporation Counsel of the City of New York, for Defendant-Appellee.

CHIN, District Judge

Fifth Avenue in Manhattan is a historic, popular, and often congested thoroughfare. It runs adjacent to Central Park and down the center of Manhattan's busy midtown business district. Every year, fifteen large parades march along some stretch of Fifth Avenue. The parades are enjoyed by viewers from all over the world. Although the parades provide entertainment and celebration, they also put a strain on New York City (the "City") by requiring street closures, causing traffic congestion, and disrupting business. Accordingly, a City regulation (the "Fifth Avenue Rule") -- that began as an informal policy in the 1970s and was codified in 2001 -- bans any "new" parades on Fifth Avenue.

In March 2005, plaintiff-appellant International Action

Center ("IAC") filed applications for permits to march on two sections of Fifth Avenue. The City, pursuant to the Fifth Avenue Rule, denied IAC the use of Fifth Avenue. In lieu of a permit to

march on Fifth Avenue, the City granted IAC a permit to march along a different route.

IAC alleges that the Fifth Avenue Rule is a content-based regulation that violates the First Amendment by discriminating against parades related to current events. For the following reasons, we conclude that the Fifth Avenue Rule does not violate the First Amendment. IAC also argues that the injunction issued by the district court curtailing the City's discretion in granting special permits should be expanded. We disagree. Finally, we hold that IAC does not have standing to challenge a provision of the parade rules that imposes penalties for a violation because it has not demonstrated that it has suffered or will suffer an injury-in-fact. Accordingly, the judgment of the district court is affirmed.

BACKGROUND

A.   New York City Parades

New York City Administrative Code (the "Code") § 10-110 provides the statutory basis for the issuance of parade permits. The Police Commissioner of the New York City Police Department (the "NYPD") is vested with the power to issue permits for any

- 3 -

"procession, parade, or race . . . [on] any street or in any public place."  N.Y.C. Admin. Code § 10-110(a).  The NYPD issues permits for approximately 700 parades per year in the five boroughs.

The Code places qualifications upon the Commissioner's authority in various circumstances, two of which are relevant here.  First, the Commissioner is not permitted to "grant a permit for the use of any street or any public place, or material portion thereof, which is ordinarily subject to great congestion or traffic and is chiefly of a business or mercantile character."  N.Y.C. Admin. Code § 10-110(a)(2).  Second, "[s]pecial permits for occasions of extraordinary public interest, not annual or customary, or not so intended to be, may be granted by the commissioner for any street or public place, and for any day or hour, with the written approval of the mayor."  N.Y.C. Admin. Code § 10-110(a)(4) (the "Special Permit Provision").  In 2001, the City further limited the Commissioner's discretion in granting special permits by limiting these to "celebrations organized by the City honoring the armed forces; sports achievements or championships; world leaders and extraordinary achievements of historic significance."  38 R.C.N.Y. § 19-01(b).

The Code also provides for the consequences of a violation:

> Every person participating in any procession, parade or race, for which a permit has not been issued when required by this section, shall, upon conviction thereof, be punished by a fine of not more than twenty-five dollars, or by imprisonment for not exceeding ten days, or by both such fine and imprisonment.

N.Y.C. Admin. Code § 10-110(c) (the "Violations Provision").

B.     Fifth Avenue Parades

Fifth Avenue is a historically preferred route for New York City parades and is considered by many the most desirable parade venue in the City.

From 1955 to 1969, the number of parades along Fifth Avenue increased from ten to eighteen. As a result, in 1971, the City adopted an informal policy barring new Fifth Avenue parades.[1] In 2001, the informal policy was codified as a regulation: "[p]ermits will be disapproved under § 10-110 of the administrative code [if] . . . [t]he application seeks to hold a parade on Fifth Avenue in the borough of Manhattan, unless the parade was held at that location prior to the promulgation of these rules." 38 R.C.N.Y. § 19-04(d)(viii).[2] The City explains

---

[1]     The City allowed four new annual parades to replace four discontinued parades between 1976 and 1984. The four new parades were the International Society for Krishna Consciousness Parade, the Pulaski Day Parade, the Marathon, and the Heritage of Pride Parade.

[2]     Prior to 2007, the Fifth Avenue Rule applied to Fifth Avenue from Washington Square Park to 133rd Street. Effective February 25, 2007, the City amended the ban to apply from 15th

that the policy was intended to address "the over-saturation" of such events "in one of the most congested sections of the City -- midtown Manhattan."  Int'l Action Ctr. v. City of New York, No. 05 Civ. 2880, 2006 U.S. Dist. LEXIS 93387 (S.D.N.Y. Dec. 26, 2006) (internal quotation marks and citation omitted).

C.    IAC's March

In March 2005, IAC applied for a permit to march along two lanes of Fifth Avenue from 100th Street to 102nd Street, where it had a permit for a rally in Central Park.  IAC filed a second application for the use of two lanes of Fifth Avenue after the rally, from 90th Street to 79th Street, for a brief demonstration in front of the Mayor's home.  The applications were filed on behalf of the Troops Out Now Coalition, which IAC founded.  The marches were intended to protest and commemorate the second anniversary of the invasion of Iraq.  Relying on the Fifth Avenue Rule, the City denied IAC the use of Fifth Avenue.  IAC was granted a permit to march along an alternative route that did not include Fifth Avenue.[3]

D.    Procedural History

On March 16, 2005, IAC commenced this action, pursuant

Street to 114th Street.

[3]    The alternative route included Madison Avenue; Lenox Avenue; 112th Street; Lexington Avenue; 102nd Street; Central Park (rally site); 90th Street; and Park Avenue.

to 42 U.S.C. § 1983, alleging that the Fifth Avenue Rule violates the First Amendment to the United States Constitution.  At the outset, prior to the completion of discovery, the City moved for summary judgment.  The district court denied the City's motion without prejudice and granted IAC leave to file an amended complaint challenging the Special Permit Provision.  See Int'l Action Ctr., 2006 U.S. Dist. LEXIS 93387.

Following the completion of discovery, the City renewed its motion for summary judgment and IAC cross-moved.  The district court upheld the Fifth Avenue Rule as content neutral and an appropriate time, place, or manner restriction.  See Int'l Action Ctr. v. City of New York, 522 F. Supp. 2d 679, 681 (S.D.N.Y. 2007).  The district court did, however, enjoin the City from granting permits for new Fifth Avenue parades pursuant to the Special Permit Provision "unless the requested use fits within the four categories set forth in" the Special Permit Provision.  Id.  The court also held that IAC lacked standing to challenge the Violations Provision.  Id. at 693.

This appeal followed.

#### DISCUSSION

We review de novo a district court's ruling on cross-motions for summary judgment, in each case construing the evidence in the light most favorable to the non-moving party. White River Amusement Pub, Inc. v. Town of Hartford, 481 F.3d

163, 167 (2d Cir. 2007).  Summary judgment is appropriate only if we conclude that the case presents "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

First, IAC argues that the Fifth Avenue Rule favors cultural parades over marches responsive to current events, and, thus, discriminates on the basis of content.  Second, even assuming the Fifth Avenue Rule is content neutral, IAC argues that it does not satisfy intermediate scrutiny.  Third, IAC argues that the injunction imposed by the district court should be expanded.  Finally, IAC argues that the Violations Provision is unconstitutional because it fails to incorporate a requirement that the accused knew that the NYPD did not grant the march a permit.  We discuss each argument in turn.

A.    Is the Fifth Avenue Rule Content Neutral?

IAC argues that the Fifth Avenue Rule imposes content-based restrictions.  A content-based restriction is subject to strict scrutiny, "such that it could only be justified by a compelling governmental interest and would have to be narrowly tailored to achieve its intended purpose."  Cablevision Sys. Corp. v. F.C.C., 570 F.3d 83, 89 (2d Cir. 2009).  For the following reasons, we hold that the Fifth Avenue Rule is content neutral, and thus subject to intermediate scrutiny.  See id.

- 8 -

at 97.

The "principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). A regulation "justified without reference to the content of the regulated speech" is content neutral. Mastrovincenzo v. City of New York, 435 F.3d 78, 98 (2d Cir. 2006) (internal quotation marks and citation omitted). "But while a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary to such a showing in all cases." Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 642 (1994).

IAC argues that the Fifth Avenue Rule "prohibits the use of Fifth Avenue for marches that are responsive to current events, but allows its use for traditional, cultural parades." Thus, according to IAC, the Fifth Avenue Rule discriminates against public discussion on the topic of current events. In support of its argument that the Fifth Avenue Rule is content based, IAC cites Boos v. Barry, in which the Supreme Court held that a D.C. regulation prohibiting protest signs of a foreign government within 500 feet of that government's embassy was a content-based restriction. 485 U.S. 312, 318-19 (1998) ("One category of speech has been completely prohibited . . . . Other

categories of speech, however, . . . are permitted."). The regulation at issue in Boos was "justified only by reference to the content of speech," and, thus, the Supreme Court concluded it was a content-based regulation. Id. at 321. The other cases cited by IAC similarly hold that regulations that differentiate between types of speech or discriminate against the press, or sections of the press, are content based. See, e.g., Republican Party of Minn. v. White, 536 U.S. 765 (2002) (regulation prohibiting judicial candidates from announcing their views on disputed political issues); Ark. Writers' Project, Inc. v. Ragland, 481 U.S. 221, 229 (1987) (tax scheme treating certain magazines "less favorably" than others); Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue, 460 U.S. 575, 591 (1983) (tax singling out the press, and targeting a small group of newspapers); Carey v. Brown, 447 U.S. 455, 460-61 (1980) (statute prohibiting picketing of residences with exceptions for peaceful labor picketing).

In contrast, the Fifth Avenue Rule does not seek to regulate messages or distinguish between different types of speech. The Fifth Avenue Rule applies to all "new" parades, irrespective of their content. There is nothing in the record to suggest that the City has banned new parades on Fifth Avenue because it is seeking to restrict speech relating to current

- 10 -

events. Although the Fifth Avenue Rule may indeed have "an incidental effect on some speakers or messages but not others," that is true of many content-neutral regulations. Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). Such an incidental effect does not convert a content-neutral regulation into a content-based one.

IAC's arguments that the Fifth Avenue Rule discriminates against parades relating to current events is unavailing. A new parade in honor of a particular nation -- which would be a cultural parade as opposed to one relating to current events -- would be denied a permit to march along Fifth Avenue in the same way IAC's permit application was denied. Indeed, many groups have applied for permits to march in honor or celebration of a variety of topics and have been denied permits under the Fifth Avenue Rule. For example, in 2001, six groups applied for Fifth Avenue permits: (1) EDB Conglomerado; (2) Dominican Day; (3) Philippine's Independence Day Parade; (4) Turkish Parade; (5) Marijuana March; and (6) Asociacion Tepeyac de New York. All six were denied Fifth Avenue parade routes. The Fifth Avenue Rule applies irrespective of content, and, thus, the Fifth Avenue Rule is content neutral.

B.   Does the Fifth Avenue Rule Meet Intermediate Scrutiny?

A content-neutral time, place, or manner regulation must meet intermediate scrutiny. That is, the regulation must

"serve a significant government interest, be narrowly tailored to serve that interest, and leave open ample alternative channels of communication." Ward, 491 U.S. at 804. Moreover, "Government-imposed restrictions on time, place, or manner of speech in a public forum will fail the neutrality requirement if they confer overly broad discretion on the regulating officials." Hous. Works, Inc. v. Kerik, 283 F.3d 471, 478 (2d Cir. 2002). As explained below, the Fifth Avenue Rule satisfies intermediate scrutiny.

### 1.    Significant Government Interest

It is not disputed that the City has a significant interest "in keeping its public spaces safe and free of congestion." Bery v. City of New York, 97 F.3d 689, 697 (2d Cir. 1996). In addition, the City has a "substantial interest in protecting its citizens from unwelcome noise," Ward, 491 U.S. at 796 (internal quotation marks and citation omitted), and, more generally, "in attempting to preserve the quality of urban life." City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 50 (1986) (internal quotation marks and citation omitted).

IAC argues that the interest claimed by the City is significantly undermined because it has allowed new parades on Fifth Avenue despite the Fifth Avenue Rule. First, in October 2004, the NYPD allowed Critical Mass to hold a bicycle ride on a portion of Fifth Avenue. The City explains that on the eve of

- 12 -

the scheduled ride, the City lost its motion for a preliminary injunction banning the ride and the court suggested that the parties negotiate a route. See Bray v. City of New York, 346 F. Supp. 2d 480, 492 (S.D.N.Y. 2004). The last-minute negotiations inadvertently disregarded the Fifth Avenue Rule. Second, on December 16, 2006, in the wake of the Sean Bell shooting, which rattled the City, the City again allowed a new march along Fifth Avenue. The group marching, Shopping for Justice, was led by Reverend Al Sharpton, who had previously vowed to have tens of thousands of participants march on Fifth Avenue with or without NYPD approval. To encourage a peaceful march, the NYPD allowed the march on Fifth Avenue despite the Fifth Avenue Rule.

Hence, the two departures were unique and isolated. They do not show that the City's stated interest in reducing congestion, limiting traffic, and minimizing business disruptions in midtown Manhattan is pretextual or not significant.

2.   Narrowly Tailored

IAC argues that the Fifth Avenue Rule is not narrowly tailored because it bans a "substantial quantity" of speech in a way that does not serve the City's interest in promulgating the restriction.

A content-neutral time, place, or manner restriction "need not be the least restrictive or least intrusive means" of

serving the government's legitimate interests.  Ward, 491 U.S. at 798.  Indeed, the narrow tailoring requirement "is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."  Id. at 799 (internal quotation marks and citation omitted).

IAC argues that the fifteen annual parades do not use the full length of Fifth Avenue, and thus the Fifth Avenue Rule is overly broad.  The City, however, provides an explanation: four annual parades take place on Fifth Avenue between 15th and 42nd Streets; eleven parades travel some stretch of Fifth Avenue between 42nd and 59th Streets; eleven parades travel some stretch of Fifth Avenue between 59th and 72nd Streets (and seven parades also start or end in this section); four parades take place on Fifth Avenue between 72nd and 86th Streets (and two disperse in the area); four large parades use Fifth Avenue from 86th through 96th Streets as their dispersal areas; and Fifth Avenue between 96th and 114th Streets contains a hospital, fire house, and health care center.

Although the question is not without difficulty, we believe that the 100-block ban is sufficiently narrowly tailored to serve the municipal interests that we have identified.  The record reflects the City's belief -- based on its considerable knowledge of traffic patterns and the effects of street closures -- that interruptions in the flow of traffic along the

upper reaches of Fifth Avenue can have adverse consequences on midtown traffic. Like the district court, we decline to substitute our opinion for the judgment of the City decisionmakers. See Int'l Action Ctr. v. City of New York, 522 F. Supp. 2d 679, 687 (S.D.N.Y. 2007); Carew-Reid v. Metro. Transp. Auth., 903 F.2d 914, 917 (2d Cir. 1990) ("[I]f the scope of the regulation is not substantially broader than required to secure the governmental interest, the regulation is not invalid simply because a court, second-guessing the decisions of the governmental body, discerns some less-restrictive alternative to the regulation."). Because the Fifth Avenue Rule promotes a significant government interest that would not be satisfied as well without it, the Fifth Avenue Rule is narrowly tailored.

### 3. Alternative Channels

IAC argues that Fifth Avenue has a "unique character" and "historic role," and, thus, other thoroughfares are inadequate alternative channels. While Fifth Avenue does indeed have a unique character, the law does not require that alternative channels be "perfect substitutes." Mastrovincenzo v. City of New York, 435 F.3d 78, 101 (2d Cir. 2006). The Fifth Avenue Rule leaves open all other streets in the City for parades. In the last nine years, IAC has conducted eleven parades in the City despite the Fifth Avenue Rule. Thus,

adequate alternative channels of communication exist.

C.    Should the Injunction Be Expanded?

The City has not cross-appealed the district court's injunction, but IAC argues that the injunction does not go far enough.

In August 2004, the Mayor approved a United for Peace and Justice ("UPJ") protest against the Republican National Convention, which proceeded on a stretch of Fifth Avenue.  The UPJ protest did not -- and the City admits as much -- meet the requirements of the Special Permit Provision.  The City argued that the UPJ permit fit the spirit and intent of the Special Permits Provision.  The district court found that the City -- in permitting the UPJ march and not the IAC march -- made a content-based distinction.  Thus, the district court concluded that the City's discretion to determine which parades satisfy the Special Permits Provision was "effectively unconstrained."  Int'l Action Ctr., 522 F. Supp. 2d at 692.  The district court enjoined the City from granting permits for new parades on Fifth Avenue in violation of the Fifth Avenue Rule, unless the requested use fits squarely within the categories enumerated in the regulation.

On appeal, IAC argues that the injunction should be broadened to apply to parades that the City authorizes without a permit.  We conclude that an enlargement of the injunction is not

necessary. The City does not have the discretion to authorize a parade without a permit in any case. The restrictions are clear: marches may not proceed without a permit; new parades are not allowed on Fifth Avenue; exceptions to the Fifth Avenue Rule must meet the Special Permit Provision; and, the City is enjoined from granting permits to marches that do not definitively meet the requirements of the Special Permit Provision. Accordingly, we affirm the district court's injunction.

D.   Does IAC Have Standing to Challenge the Violations
     Provision?

Finally, IAC argues that the Violations Provision is facially unconstitutional because it provides for strict liability in violation of the First Amendment. IAC does not have standing to challenge this provision. A plaintiff has Article III standing to bring suit if

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000). IAC argues that it has a significant First Amendment interest in communicating its message in such a way as to stir bystanders to "join spontaneously." IAC

- 17 -

submits that the strict liability regime injures IAC because it will "chill some from joining its marches, for fear of prosecution, even when those marches are permitted."

IAC failed to provide sufficient evidence that it has or will suffer an injury-in-fact. The "chill" on those that may spontaneously join IAC's marches is purely conjectural. See Latino Officers Ass'n v. Safir, 170 F.3d 167, 170 (2d Cir. 1999) ("Allegations of a subjective chill [of First Amendment rights] are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." (internal quotation marks and citation omitted)). Accordingly, IAC does not have standing to pursue this claim.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the District Court.